DODSON LIVESTOCK COMPANY,
Plaintiff,

v.

UNITED STATES, Defendant.

No. 95–771C.

United States Court of Federal Claims.

Feb. 2, 2001.

Michael P. Guta, Oakland, California, attorney of record for the plaintiff.

Shalom Brilliant, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and David M. Cohen, Director, Commercial Litigation Branch, attorneys of record for the defendant. L. Benjamin Young, United States Department of Agriculture, Washington, D.C., of counsel.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

As found by the court in its earlier opinion, *Dodson Livestock Co. v. United States*, 42 Fed.Cl. 455, 457–59 (1998), and as supplemented to the extent necessary, the plaintiff, Dodson Livestock Company (Dodson Livestock), is a Missouri corporation specializing in the production of sheep and goats. Prior to August, 1992, Dodson Livestock stated that it had a thriving cashmere goat business and had gained a reputation as a breeder of quality purebred sheep and goats. In the early part of 1992, plaintiff stated that it began to formulate plans to become a leader in the breeding of Texel sheep. Dodson Livestock intended to develop a purebred Texel flock for sale to other breeders of both purebred and commercial flocks.

As a result of federal import restrictions, the only source of Texel sheep in the United States in 1992 was the United States Meat Animal Research Center (MARC) in Clay Center, Nebraska. On July 8, 1992, the MARC published a flyer advertising the U.S. MARC Annual Surplus Breeding Sheep Sale auction to be held on August 14, 1992. The flyer stated: "[e]nclosed is performance or pedigree information for sale rams and Texel ewes. Full performance information will be available on all the sale ewes the day of the sale. All animals sold will be sound, healthy, guaranteed breeders."

MARC used an independent testing laboratory, Allied Monitor, to screen the sale sheep for paratuberculosis, otherwise known as Johne's disease, and other common maladies by using an Enzyme–Linked Immunosorbent Assay (ELISA) test and an Agar Gel Immunodiffusion (AGID) test. The ELISA test scores range from 1.0 to 10.0. Allied Monitor assigned the following numerical ranges: anything less than 1.4 was considered negative, while a score between 1.5–2.0 was considered suspect. Although the ELISA test does not detect the disease itself, it does detect the presence of antibodies. The ELISA test was used initially, and then any animal whose score exceeded 2.0 was considered positive and subsequently tested with the AGID test. In addition to the testing by Allied Monitor, a MARC Herd health veterinarian examined each animal before the auction to be held on August 14, 1992, and verified that all animals to be offered for sale in the auction were free of clinical signs of paratuberculosis. Any animal diagnosed positive for paratuberculosis based on the AGID test, or manifesting clinical signs of the disease observed upon professional examination, was not offered for sale in the 1992 auction.

Potential buyers, including Dennis Dodson, the President of Dodson Livestock, were provided with a sale catalogue when they registered for the auction. Copies of the catalogue also were distributed on site for the buyers' convenience. The catalogue contained detailed information for the individual sheep, such as identification number, date of birth, weight, and fertility rate. It also included a *"REMARKS"* section setting out general sheep purchasing details, such as acceptable forms of payment, arrangement of subsequent transportation, and the health condition of the sheep at the time of auction. The following paragraph was found under the heading *"Condition and Health"* in the *"REMARKS"* section of the catalogue:

> All mature animals were recently treated for internal and external parasites, foot trimmed, and foot bathed. The MARC flocks harbor some level of Paratuberculosis (Johne's) and Ovine Progressive Pneumonia (OPP) infections. Based on the availability of reliable tests, or observations, efforts have been made to screen sale animals against these and other maladies.

In addition, an auction supervisor read the *"General"* and *"Condition and Health"* sections of the sale catalogue verbatim to the

buyers prior to beginning the sale. The buyers then were notified which sheep were withdrawn due to illness; however, the buyers were not apprised of the quantitative test results. The parties have stipulated that Dennis Dodson received the catalogue the night before the auction, but that he did not read the "*REMARKS*" section.

At the auction, Dodson Livestock purchased eighteen purebred Texel sheep, including fifteen ewes and three rams. Dodson Livestock paid $83,650.00 for the sheep, including $15,500.00 for one ram identified as number 806173. Of the eighteen sheep, ram number 806173 and five other sheep tested "suspect" on the ELISA test. The reported ELISA test result for ram number 806173 was 1.5. The AGID test was not performed on this ram. Two of the sheep purchased by Dodson tested above 2.0, but their subsequent AGID tests were negative.[1]

Approximately a year later, in September 1993, ram number 806173 began to display symptoms of an overall weakened condition that included weight loss, lack of appetite, and diarrhea. A preliminary examination, conducted at the Department of Clinical Sciences, Veterinary Medical Teaching Hospital at Kansas State University, indicated that the ram suffered from paratuberculosis. According to plaintiff, once an infected animal is discovered within a flock, the recommended course of treatment is to destroy or to sell for slaughter the entire flock. The treating veterinarian recommended that the ram be euthanized. A subsequent autopsy revealed that the initial diagnosis of paratuberculosis was correct. Dodson Livestock consulted with sheep veterinarians concerning the effect that the contaminated ram may have had on other Texel sheep and cashmere goats with which it came into contact, and, due to the risk of contamination, sold for slaughter both herds in their entirety.

On August 16, 1994, Dodson Livestock filed a certified claim with a government contracting officer. The introduction to the claim said that it "concern[ed] damages sustained by Dodson Livestock because of breach of representations concerning Texel sheep purchased by Dodson Livestock at [the auction]." After outlining the plaintiff's allegations regarding the factual circumstances behind the sheep purchase, the claim read as follows:

All available evidence indicates that the infected ram had paratuberculosis when it was sold to Dodson Livestock in 1992 by U.S. MARC. This is due to the fact that this disease is contracted by animals when they are young (primarily in their first year of life) and the disease's long period of incubation. The information provided to Dodson Livestock at the August 14, 1992 sale indicated that the ram had a birthdate of April 4, 1988, making it four years old as of the date of sale. Scientific evidence indicates that it is unlikely for a ram of this age to contract paratuberculosis, as opposed to becoming a carrier. Additionally, information provided at the auction sale indicated that all Texel sheep sold at the sale had been quarantined at the U.S. MARC facility prior to the sale. Accordingly, the only conclusion is that the ram was infected with paratuberculosis upon its sale to Dodson Livestock.

The sale information distributed prior to the auction and at the auction indicated that all sheep sold would be sound, healthy, guaranteed breeders. Within the sheep industry, such a statement means that all subject sheep would be free from any diseases that affect their marketability as breeders.... As a result of the indicated ram being infected with paratuberculosis, Dodson Livestock had to sell its entire flock of Texel sheep and cashmere goats. Dodson Livestock no longer has the ability to become the leading producer of Texel breeding sheep within the United States because of this occurrence. The

---

1. Plaintiff's second claim to the contracting officer, dated March 19, 1999, and plaintiff's first amended complaint, filed January 6, 2000, indicate that "all three of the rams and at least four of the fifteen ewes purchased by Dodson were infected with paratuberculosis." The parties stipulated on March 13, 1997 that ram number 806173 and "five other sheep purchased by Dodson at the August 14, 1992 auction were in the 1.5 to 1.7 range," and that "two sheep purchased by Dodson at the August 14, 1992 auction were above 2.0 [on the ELISA test]," but that results of further testing (the AGID test) on these last two sheep were negative.

conduct of U.S. MARC in selling the ram infected with paratuberculosis constitutes a breach of its representation that the animal would be a sound, healthy and guaranteed breeder. In addition, this constitutes a breach of the implied warranty of merchantability in that it is expected that such an animal would pass within the industry without paratuberculosis. This conduct by U.S. MARC creates a breach of the Sales Contract and has resulted in substantial damages to Dodson Livestock.

The claim also included a damages calculation based on work done by Dr. Patrick McMurry, a Professor of Economics at Missouri Western State College in St. Joseph, Missouri. According to the plaintiff, "[t]he damages calculated are lost profits from sales of sheep and goats anticipated for 1993–98 and discounted to present value." The damages as allegedly "conservatively" estimated, amounted to $57,628,202.00.

In a letter dated November 29, 1994, the Department of Agriculture responded to Dodson Livestock and issued a final rejection of its claim. The letter read in pertinent part as follows:

> This letter is in response to the Claim of Dodson Livestock Co., dated August 16, 1994, ... in the amount of $57,628,202 arising out of a sales contract for Texel sheep on August 14, 1992.
>
> For the reasons expressed below, this claim is denied in its entirety: first, MARC did not breach any representation concerning Texel sheep purchased by Dodson Livestock at the August 14, 1992, auction because the sale catalog expressly stated that "The MARC flocks harbor some level of Paratuberculosis (Johne's) and Ovine Progressive Pneumonia (OPP) infections."; second, MARC did not breach any implied warranty of merchantability, if such existed, because MARC had effectively disclaimed any such implied warranty of merchantability by making the above-mentioned disclaimer in the sale catalogue.

Dodson Livestock subsequently filed its complaint in this court. Thereafter, it became apparent that the parties disagreed as to whether Dodson had stated a claim with respect to the entire flock of Texel sheep purchased at the auction, or only as to the one infected ram. On May 30, 1998, the government filed a motion to dismiss "so much of plaintiff's complaint as may be construed to assert a cause of action other than for breach of warranty in the sale of the one ram [identified as number 806173]." The government argued that this court does not have jurisdiction to hear claims either beyond the single ram or relating to MARC's alleged failure to inform Dodson Livestock of any test results prior to the auction, because such claims were not submitted to the contracting officer as required by the Contract Disputes Act.

In an opinion dated December 23, 1998, the court granted the defendant's motion to dismiss, dismissing all claims, without prejudice, except the plaintiff's breach of warranty claim for ram number 806173. *Dodson Livestock Co. v. United States,* 42 Fed.Cl. 455, 463 (1998). The court also dismissed, without prejudice, plaintiff's claim that the defendant breached its duty to disclose Allied Monitor's test results. *Id.* The court noted section 605(a) of the Contract Disputes Act requires that claims brought under the Contract Disputes Act first must be submitted in writing to the contracting officer for a final decision. *Id.* at 460. Although plaintiff argued that it had presented a claim to the contracting officer encompassing all eighteen Texel sheep, *id.* at 461, the court concluded that the contracting officer had not been presented with a breach of contract claim for all these sheep, and that the contracting officer had not been presented for review any claim that the government breached an alleged duty to disclose pre-auction test results. *Id.* at 462. This latter theory of recovery was not raised by the plaintiff until more than a year after the complaint in this court was filed. *Id.* at 463. By the dismissal, without prejudice, of claims other than a breach of warranty for ram number 806173, the plaintiff was afforded the opportunity to present its other claims and other theories of recovery to the cognizant contracting officer pursuant to 41 U.S.C. 605(a), and, if denied or unanswered by the contracting officer, to refile those claims in the United States Court of Federal Claims.

On March 19, 1999, plaintiff submitted a second claim to the contracting officer. The claim alleged that three rams and at least four of the fifteen ewes sold by the government to the plaintiff were infected with paratuberculosis in breach of warranty, and further alleged that the government had a duty to disclose the test results reflecting the paratuberculosis. The claim recounted that the entire herd of Texel sheep as well as cashmere goats were destroyed due to contact with one infected ram, and attached the original August 16, 1994 claim, with its certification of the claimed amount of $57,628,202.00.

By letter dated July 1, 1999, the contracting officer declined to render a final decision on the plaintiff's second claim. The contracting officer noted that both the theories of recovery and the number of sheep alleged to be infected had changed from the first claim, but decided that, since the amount of the second claim was the same as the amount of the first claim, he lacked "authority to render a decision while litigation over the one ram seeking the same monetary damages is still pending" in the Court of Federal Claims. The contracting officer also noted the absence of a fresh certification of the claimed amount. The only certification found in the second claim was the certification enclosed with the first claim, which was an attachment to the second claim.

On March 15, 2000, the plaintiff filed a third claim with the contracting officer, reproducing the second claim, but adding a fresh certification, dated March 6, 2000, in the amount of $57,628,202.00. The contracting officer did not issue a final decision on this third claim, instead forwarding the claim to agency counsel in a letter dated March 23, 2000.

## DISCUSSION

The defendant has filed a motion for summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims. Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party must demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir. 1996), *reh'g denied* (1997); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991). A fact is material if it will make a difference in the result of a case. *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). Summary judgment "saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. 'Useless' in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result." *Dehne v. United States*, 23 Cl. Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.*, 739 F.2d 624, 626 (Fed.Cir. 1984)), *vacated on other grounds*, 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.*, 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (C.C.P.A.1968). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505; *Lane Bryant, Inc. v.*

*United States*, 35 F.3d 1570 (Fed.Cir.1994). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991) (table). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.* at 587–88, 106 S.Ct. 1348; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied* (1998); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir. 1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied* (1995); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if the parties allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987)). After reviewing the record and the filings submitted by the parties, the court finds that there are no material issues of fact

which would preclude consideration of the defendant's motion for summary judgment.[2]

*Jurisdiction under the Contract Disputes Act* [3]

█ The defendant raises jurisdictional defects, arguing that "the claim that Dodson purported to present to the contracting officer in 1999 was the same as the claim already pending in this Court at that time, and, therefore, the contracting officer lacked the authority to issue a final decision on the claim." Defendant is referring to the role of the Department of Justice to resolve disputes, rather than the agency contracting officer, once a claim is in litigation.[4] The court notes that defendant had argued in its earlier motion to dismiss that "[i]f Dodson wishes to pursue breach of warranty claims concerning sheep other than the ram referenced in the [initial] August 16, 1994 claim letter, or concerning MARC's alleged failure to inform Dodson of test results, Dodson must first present these claims to the contracting officer for a decision. Currently, this Court lacks jurisdiction to entertain these claims." The subsequent claim which plaintiff presented to the contracting officer, who declined to address it, alleged the infec-

tion of additional sheep with paratuberculosis and the additional theory of recovery.

Defendant now argues that the two claims are the same, since the same amount based on the same triggering events are alleged in each claim, citing *Johnson Controls World Services, Inc. v. United States,* 43 Fed.Cl. 506, 511 (1999), *appeal dismissed,* 217 F.3d 853 (Fed.Cir.1999) (table), which, in turn, cited *Sharman Co. v. United States,* 2 F.3d 1564, 1571 (Fed.Cir.1993). Defendant argues that the amount of damages in plaintiff's first and second claims are the same ($57,628,-202.00), and are based on the same triggering events. The defendant does not specify the "triggering events" it is referring to in this case, perhaps using the term to refer to the underlying facts of the case. The subject matter of the second claim, however, is different from the subject matter of the first. The first claim alleges the government's breach of warranty of a single ram. The second claim alleges both a breach of warranty and a failure to disclose test results for two different rams and at least four ewes. The court notes the government's acknowledgment that the purchase of each individual sheep is a separate contract.[5] Defendant

**2.** The court has before it the defendant's motion for summary judgment, and the plaintiff's opposition to the defendant's motion. However, the plaintiff, in its opposition, observes that: "On this record, the Court could grant Plaintiff partial summary judgment *sua sponte* as to Defendant's liability for breach of contract, as to all sheep purchased at the August, 1992 auction."

**3.** The Contract Disputes Act "applies to any express or implied contract ... entered into by an executive agency for ... (4) the disposal of personal property." 41 U.S.C. § 602(a)(4) (1994).

**4.** The basis for the government's contention that the contracting officer was without authority to issue a final decision on [the contractor's] equitable adjustment claim is the rule that "[o]nce a claim is in litigation, the Department of Justice gains exclusive authority to act in the pending litigation." *Sharman Co. v. United States,* 2 F.3d 1564, 1571 (Fed.Cir.1993). The "exclusive authority" given to the Department of Justice "divests the contracting officer of his authority to issue a final decision on the claim." *Id.* at 1571. This rule arises from 28 U.S.C. §§ 516–20 (1994). Most importantly, under 28 U.S.C. § 516, "[e]xcept as otherwise authorized by law, the conduct of litigation in which the United States ... is a party ... is reserved to officers of the Depart-

ment of Justice, under the supervision of the Attorney General."

*Case, Inc. v. United States,* 88 F.3d 1004, 1009 (Fed.Cir.1996) (footnote omitted). See also 5 U.S.C. § 3106 (1994), which states: "Except as otherwise authorized by law, the head of an Executive department or military department may not employ an attorney or counsel for the conduct of litigation in which the United States, an agency, or employee thereof is a party, or is interested, or for the securing of evidence therefor, but shall refer the matter to the Department of Justice."

**5.** In its motion to dismiss, the government provided that:

[The sale of ram number 806173] is fundamentally different from a claim that one or more *other* sheep sold at the auction were infected by a disease. Indeed, any claims with respect to the sale of the other sheep would involve different contracts. Each of the sheep was separately put up for sale at the auction. Dodson bid $15,500.00 for the ram in question, and that bid was accepted. Dodson separately bid, successfully, on 17 other sheep.... [E]ach time the Government accepted a bid from Dodson or any other buyer for a particular sheep, a contract was formed for the sale of that sheep. (Emphasis in original.)

cannot have it both ways. Defendant cannot contend that plaintiff's first claim was exclusively a breach of warranty for a single ram, then contend that plaintiff's second claim for breach of warranty and nondisclosure of test data for at least six different sheep, purchased in separate contracts, is a mirror image of the first claim.[6]

In contrast, the two claims in *Sharman* were a single claim for progress payments. The United States Court of Appeals for the Federal Circuit in *Case, Inc. v. United States* also distinguished *Sharman:*

> In *Sharman,* both the contractor's initial claim asserting entitlement to progress payments and the government's subsequent counterclaim for the return of progress payments involved precisely "the same money based on the same partial performance, only under a different label." [*Sharman Co. v. United States,* 2 F.3d] at 1571. Thus, we referred to the contractor's claim as being the "mirror image" of the government's counterclaim. *Id.* at 1573. Here, however, the claim in *Case I* was separate and distinct from the claim in *Case II* .... That both *Case I* and *Case II* arose out of the same underlying set of facts and involved allegations of defective specifications does not alter the fact that the two cases involved different claims.

*Case, Inc. v. United States,* 88 F.3d at 1010. In the lawsuit before this court, the second claim alleges different sheep, purchased in different contracts, with a different theory of recovery, which is distinct from the claim associated with the single ram of the first claim. This court does not find a *Sharman* violation under these facts.

 The defendant also argues that the plaintiff's second, March 19, 1999 claim does not contain all of the elements of a valid claim. Defendant first notes that a Contract Disputes Act claim must seek "the payment of money in a sum certain...." 48 C.F.R. § 33.201 (1998); *see Johnson Controls World Servs., Inc. v. United States,* 43 Fed.Cl. 589,

592 (1999) ("Although the CDA does not specify the elements of a valid claim, the Federal Circuit has adopted the definition set forth in 48 C.F.R. (FAR) § 33.201 ....") (citing *Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1575 (Fed.Cir.), *reh'g denied* (1995)); *see also D.L. Braughler Co. v. West,* 127 F.3d 1476, 1480 n. 4 (Fed.Cir.1997); *Scan–Tech Sec., L.P. v. United States,* 46 Fed.Cl. 326, 330 (2000) (citing *James M. Ellett Constr. Co., Inc. v. United States,* 93 F.3d 1537, 1541–42 (Fed.Cir.1996)). Defendant notes that the plaintiff's March 19, 1999 claim did not specify any sum, but attached plaintiff's first, August 16, 1994 claim, which had requested the sum of $57,628,202.00. A valid claim must give adequate notice to the contracting officer of the basis and amount of the claim. *Johnson Controls World Servs., Inc. v. United States,* 43 Fed.Cl. at 592 (citing *Volmar Constr., Inc. v. United States,* 32 Fed.Cl. 746, 752 (1995)) (citing *Contract Cleaning Maint., Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987)). A valid claim may be found in more than one document. *See Johnson Controls World Servs., Inc. v. United States,* 43 Fed.Cl. at 592 (citing *Volmar Constr., Inc. v. United States,* 32 Fed. Cl. at 753–54) (in turn citing *Contract Cleaning Maint., Inc. v. United States,* 811 F.2d at 592). The court finds that the contracting officer was adequately placed on notice through the attachment to the second claim of the March 12, 1997 declaration of Dennis Dodson, the President of Dodson Livestock Company, which described the loss of the animals, and alleged the loss at $57,628,202.00.

Defendant argues that claims in excess of $100,000.00 must be certified pursuant to 41 U.S.C. § 605(c)(1), and argues that the plaintiff's March 19, 1999 claim was not certified. Regarding a claim, the Federal Acquisition Regulation (FAR) states that "a written demand or written assertion by the contractor seeking the payment of money exceeding

---

6. Although the amount claimed is the same in all of the plaintiff's claims, that fact is not dispositive under these circumstances, given the differing triggering events between the first claim and the subsequent claims. Plaintiff was under the impression that his first claim was broader than

it actually was, and attempted to cure the defect by presenting the broader claims to the contracting officer, thereby attempting to justify the amount of damages to which it believed it was entitled.

$100,000 is not a claim under the Contract Disputes Act of 1978 until certified as required by the Act and [FAR] 33.207." 48 C.F.R. § 33.201 (1998); *see Case, Inc. v. United States,* 88 F.3d 1004, 1009 (Fed.Cir. 1996) (citing *Ball, Ball & Brosamer, Inc. v. United States,* 878 F.2d 1426, 1428 (Fed.Cir. 1989) (where a claim is not properly certified, there is no valid claim for a contracting officer to decide)). The second, March 19, 1999 claim attached, for reference, the plaintiff's first, August 16, 1994, certified claim in the amount of $57,628,202.00. No language in the March 19, 1999 claim, however, attempted to incorporate, adopt, or recertify this previously certified amount from the earlier claim. On March 15, 2000, after defendant had filed its motion for summary judgment which discussed this certification deficiency, plaintiff filed a third claim with the contracting officer. This last claim was certified in the amount of $57,628,202.00. The contracting officer did not issue a final decision, but forwarded the third claim to agency counsel. This last claim may be "deemed denied" through the passage of sixty days from the presentation of the claim to the contracting officer. *See* 41 U.S.C. § 605(c)(2), (5) (Failure of the contracting officer to issue a decision on a claim within sixty days "will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim . . . ."). Plaintiff has not moved to amend its complaint in the pending lawsuit in the Court of Federal Claims since this deemed denial. The discussion below of the remaining issues in this case, however, moots the issue.[7]

*Breach of Warranty*

The plaintiff alleges that the defendant provided a warranty that sheep bought at the August 14, 1992 auction would be sound and healthy breeders. A March 3, 2000, declaration by Mr. Dodson stated that:

7. The sale information distributed prior to the auction and at the auction indicated that all sheep sold would be sound, healthy, guaranteed breeders. I understood the statement to mean that all sheep

would be free from any diseases that affect their marketability as breeders. Paratuberculosis is a disease that has no cure, is generally fatal in infected animals, and seldom treated with success. . . . Once an infected animal is discovered within a flock, the recommended course of treatment is to destroy or sell for slaughter the entire flock as its salability as breeding stock is nonexistent. As a result of the indicated ram being infected with paratuberculosis, Dodson Livestock had to sell its entire flock of Texel sheep and cashmere goats.

The bill of sale between MARC and Mr. Dodson expressly guarantees the title to the sheep, but provides no further warranty of the health and soundness of the sheep. The bill of sale contains the following language:

THIS IS TO CERTIFY THAT THE ROMAN L. HRUSKA U.S. MEAT ANIMAL RESEARCH CENTER [MARC] AND THE UNIVERSITY OF NEBRASKA HAVE, THIS 14TH DAY OF AUGUST 1992, BARGAINED AND SOLD THE FOLLOWING DESCRIBED SHEEP, AND DO HEREBY GUARANTEE THE TITLE THERETO, TO:

BUYER NUMBER: 3

DENNIS, DODSON

DODSON LIVESTOCK

RR1, BOX 270

BIGLAKE BIGELOW, MO 64437

The bill of sale then lists the eighteen sheep, with their lot number, description, and price.

Plaintiff's argument relies on a July 8, 1992 advertisement titled "U.S. MARC ANNUAL SURPLUS BREEDING SHEEP SALE," which contained various information on the date and place of the sale; pedigree information on the animals for sale, such as "15 Purebred Texel yearling ewes"; the date and time of a seminar on research findings and for a pay as you go lamb supper; and the statement, highlighted by the plaintiff, that "[a]ll animals sold will be sound, healthy, guaranteed breeders." Although both parties acknowledge the existence of this flyer, their views differ over its significance. The

---

7. Plaintiff filed a first amended complaint on January 6, 2000, but did not submit its third, certified claim to the agency contracting officer until March 15, 2000.

plaintiff argues that the quoted language of the advertisement constituted a binding guarantee on the health of the Texel sheep.

In support of its argument that the statement in the July 8, 1992 advertisement is a warranty, the plaintiff quotes language from the treatise, *Corbin on Contracts:*

> Although a dealer's advertisements of his goods, in circulars and periodicals or by radio, are seldom to be interpreted as in themselves offers creating a power of acceptance, the descriptive statements made therein as to quality of the goods may sometimes be reasonably understood to be warranties that become a part of a contract for sale of such goods that is subsequently entered into with a buyer.

Arthur L. Corbin, 1 *Corbin on Contracts* § 25, at 76 (1963) (footnote omitted). The plaintiff, however, omitted the remainder of the paragraph from *Corbin on Contracts,* which states:

> This is not so if the advertised statements would be taken by a reasonable person to be mere "puffing" or expressions of opinion. The question depends upon the usual principles of interpretation and upon the expressions of the parties in their negotiations subsequent to the advertisement.

Arthur L. Corbin, 1 *Corbin on Contracts* § 25, at 76 (1963). Furthermore, contained in the paragraph immediately above the language quoted by the plaintiff is the proposition that advertisements "are understood to be mere requests to consider and examine and negotiate ...." *Id.* § 25, at 75; *see Mesaros v. United States*, 845 F.2d 1576, 1580 (Fed.Cir.1988) (materials mailed to prospective customers are no more than advertisements or invitations to deal); *Reforestacion de Sarapiqui v. United States*, 26 Cl.Ct. 177, 189 (1992) (advertisements are merely an invitation to deal), *aff'd*, 985 F.2d 583 (Fed.Cir.1992) (table); *Hartle v. United States*, 18 Cl.Ct. 479, 482 n. 5 (1989) (as a general rule, advertisements without more

are not part of any ensuing contract) (citing 1 Corbin on Contracts § 25, at 75 (1963)).[8]

In the instant case, regardless of the legal significance plaintiff wishes to accord the flyer advertising the auction, in the language of the *Corbin* section relied on by the plaintiff, the government made "expressions ... subsequent to the advertisement," *id.* § 25, at 76, which reasonably served to modify the expectations of buyers, including Mr. Dodson, as to the condition and health of the sheep for sale. The defendant contends that it is not liable to the plaintiff because the government did not warranty the sheep in question to be free of paratuberculosis, and, in fact, disclosed "that these sheep *were* exposed to the disease." (Emphasis in original.) Defendant relies on a sale catalogue, which was published for the August 14, 1992 auction, containing pertinent information about the sale in the *"REMARKS"* section, such as how checks should be made out, minimum acceptable bids, information on sheep registration papers, and breeding information. Under the *"General"* heading of the remarks section, the sale catalogue stated: "Animals become buyer's risk when sold." Furthermore, under the *"Condition and Health"* heading of the remarks section, the sale catalogue stated:

> All mature animals were recently treated for internal and external parasites, foot trimmed, and foot bathed. The MARC flocks harbor some level of Paratuberculosis (Johne's) and Ovine Progressive Pneumonia (OPP) infections. Based on the availability of reliable tests, or observations, efforts have been made to screen sale animals against these and other maladies.

A February 8, 2000 declaration by Michael Wallace, the Sheep Operations Manager for the MARC, stated that:

> 8. I was present at and supervised the MARC sheep sale on August 14, 1992. On

---

**8.** Plaintiff argues that the representation that the sheep would be sound and healthy "was not merely placed in an advertisement," citing, in addition, a "July 8, 1992, letter specially addressed to Mr. Dodson" providing the same alleged warranty. Plaintiff included this cited letter in an appendix to its opposition brief. The

"letter" is the same advertising flyer described above. As Mr. Wallace, the government Sheep Operations Manager, noted in his declaration, "[p]rior to the sale I caused an advertisement, dated July 8, 1992, to be distributed to potential buyers that publicized the event."

that day, Dennis Dodson of Dodson Livestock was present and was registered as buyer number 3. As is my custom, I began the sale at 9:00 a.m. First I introduced myself, then Dr. D.B. Laster, the Director of MARC, then some members of the MARC staff. I then read verbatim the paragraphs entitled "General" and "Condition and Health" from the "Remarks" page of the sale catalogue, including the statement that the "MARC flocks harbor some level of Paratuberculosis." After reading the "Remarks" page I asked the buyers if there were any questions. I do not recall there being any questions from the buyers about the sheep at that sale.

Plaintiff acknowledged receipt of the sale catalogue, which included notice that the MARC herds harbor some level of paratuberculosis, although he denied that he read the remarks section. Plaintiff also acknowledged that at the auction Mr. Wallace read the statement indicating that the MARC flocks harbor some level of paratuberculosis and Ovine Progressive Pneumonia. *See United States v. Blair,* 193 F.2d 557, 560 (10th Cir.1952) (The purchaser at an auction "may rely upon such announced terms and conditions of the sale, and he is likewise bound thereby, whether present at the time of the announcement or has knowledge thereof."); *accord Love v. Basque Cartel,* 873 F.Supp. 563, 570 (D.Wyo.1995), *aff'd sub nom. Dry Creek Cattle Co. v. Basque Cartel,* 95 F.3d 1161 (10th Cir.1996) (table); *Finnish Fur Sales Co. v. Juliette Shulof Furs, Inc.,* 770 F.Supp. 139, 145 (S.D.N.Y.1991).

The plaintiff argues that the language of the advertising flyer and the language of the sale catalogue were not inconsistent:

> The statement the flock "harbor some level of paratuberculosis," is not inconsistent with the statement that the sheep sold would be "sound, healthy, guaranteed breeders." An ELISA reading of below 1.5 is considered a negative, test despite the presence of paratuberculosis antibodies .... Thus a reference to the "level of paratuberculosis" can be reasonably read to mean the animals were tested to carry measurable levels of paratuberculosis anti-

bodies but at a level less then 1.5, a negative result.

As discussed earlier, the parties stipulated that the ELISA and AGID tests were developed for cattle, but have been found to be useful in determining the presence of paratuberculosis in sheep. The ELISA test does not actually detect paratuberculosis, but detects the presence of antibodies. If the ELISA test results are positive (that is, in the range of 2.1 to 10.0), then the AGID test is used as a follow-on test for paratuberculosis. For example, the ELISA test results for two sheep subsequently purchased by the plaintiff were above 2.0, but the results of the subsequent AGID test on these two sheep were negative for paratuberculosis. The ELISA test results for ram number 806173 and five other sheep were in the 1.5 to 1.7 range. The AGID test was not used on these six sheep, since, as the parties stipulated, the AGID test is used to "confirm positive ELISA results," and the scores for the six sheep were not positive (that is, did not range from 2.1 to 10.0). All of the sheep offered for sale were personally examined by a MARC Herd Health Veterinarian, and found to be free of clinical signs of paratuberculosis. No sheep testing positive under the ELISA/AGID testing regime, or demonstrating clinical signs of paratuberculosis, were offered for sale at the August 14, 1992 auction.

The interpretation of a government contract is a matter of law. *See Giove v. Dep't of Transp.,* 230 F.3d 1333, 1340 (Fed. Cir.2000); *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990 (Fed.Cir.1996); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972, 973 (1965). The language of the contract "must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States,* 351 F.2d at 975. Moreover, words are to be given their plain and ordinary meanings. *Giove v. Dep't of Transp.,* 230 F.3d at 1340; *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 591 F.2d 629, 633 (1979). In addition, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *See Mastrobuono v. Shearson*

*Lehman Hutton, Inc.,* 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); *Jowett, Inc. v. United States,* 234 F.3d 1365, 1368 (Fed.Cir.2000); *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1434 (Fed.Cir.), *reh'g denied* (1996); *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir. 1985) (citing *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir. 1983)). To ascertain the intentions of the parties, the contract should be construed in its entirety "so as to harmonize and give meaning to all its provisions." *Giove v. Dep't of Transp.,* 230 F.3d at 1340; *Thanet Corp. v. United States,* 591 F.2d at 633 (citing *ITT Arctic Servs., Inc. v. United States,* 207 Ct. Cl. 743, 524 F.2d 680, 684 (1975); *Northwest Marine Iron Works v. United States,* 203 Ct.Cl. 629, 493 F.2d 652, 657 (1974)).

▮ Plaintiff argues, as noted above, that the advertising flyer ("sound, healthy, guaranteed breeders") and the sale catalogue ("some level of Paratuberculosis" infection) can be read as consistent with one another—if MARC may be viewed as effectively warranting that all sale sheep tested negatively on the initial test, that is, between 1.0 and 1.4 on the ELISA test. However, an interpretation that the sheep tested negative for paratuberculosis is too restrictive an explanation of the sale catalogue's language of "some level of Paratuberculosis." Some level of paratuberculosis is consistent with the 1.5 to 1.7 ELISA levels actually found in the six sheep purchased by the plaintiff. By way of contrast, the same section of the sale catalogue titled *"Condition and Health"* contained language that all rams "are serologically negative for *Brucella ovis* . . . ." There was no similar language in the sale catalogue that all sheep were negative for paratuberculosis; the language, instead, warned of some level of paratuberculosis in the MARC flocks. Furthermore, the advertising flyer does not mention paratuberculosis, but the sale catalogue does. Under such circumstances, the more specific statement, in this case, the sale catalogue, should control. *See Daff v. United States,* 78 F.3d 1566, 1574 (Fed.Cir.), *reh'g denied* (1996) ("specific contract provisions prevail over general provisions") (citing *Hol–Gar Mfg. Corp. v. United States,* 351 F.2d at 980 ("where an agreement contains general and specific provisions which are in any respect inconsistent or conflicting, the provision directed to a particular matter controls over the provision which is general in its terms")).

Mr. Wallace, the MARC Sheep Operations Manager, in his February 8, 2000 declaration, indicated that the sheep would be sound and healthy at the time of the auction, "notwithstanding the possibility that some of the sheep later in their lives might experience some of the degenerative diseases that were present within the MARC flock, as disclosed in the sale catalogue." Plaintiff's proffered explanation of the advertising flyer and the sale catalogue is not persuasive; Mr. Wallace's explanation is consistent with the language of both documents and is reasonable. Furthermore, the sale catalogue provided that "[a]nimals become buyer's risk when sold." The risk that sheep not testing positive for paratuberculosis at the time of sale, would subsequently test positive, was placed on the plaintiff by this language.

Plaintiff also argues that, "since the warranties were drafted by defendant any ambiguity must be construed against defendant." If ambiguities are patent, however, plaintiff has the duty to inquire and to seek clarification of the ambiguities. The United States Court of Appeals for the Federal Circuit has held that:

> A contract provision is deemed to be patently ambiguous if it is susceptible of two different yet reasonable interpretations, each of which is consistent with the contract language and with the other provisions of the contract, and if the ambiguity would be apparent to a reasonable person in the claimant's position. *See Community Heating & Plumbing Co., Inc. v. Kelso,* 987 F.2d 1575, 1579 (Fed. Cir.1993). If a patent ambiguity exists, the rules of government contracting place the obligation of inquiry upon the contractor.

*Lockheed Martin IR Imaging Sys., Inc. v. West,* 108 F.3d 319, 322 (Fed.Cir.1997) (citations omitted).

This court does not find plaintiff's interpretation of the advertising flyer and the sale

catalogue to be reasonable. However, even if the plaintiff's interpretation were deemed reasonable, and the documents were to be found ambiguous, the ambiguity would be patent, and the plaintiff would have had a duty to inquire and to seek clarification from MARC. *See also United Int'l Investigative Servs. v. United States,* 109 F.3d 734, 738 (Fed.Cir.1997) (reflecting a patent ambiguity between the "scope of work" and the "personnel" sections of a contract); *S.J. Amoroso Constr. Co., Inc. v. United States,* 12 F.3d 1072, 1076 (Fed.Cir.1993) (the contractor should have realized a clause was included in error, and, therefore, had a duty to inquire); *Kolar, Inc. v. United States,* 227 Ct.Cl. 445, 455, 650 F.2d 256, 262 (1981) ("Contrary to plaintiff's claim that the defendant warranted that the material was safe . . . the defendant expressly put the plaintiff on notice of the hazardous nature. . . ."); *Galli v. Metz,* 973 F.2d 145, 151 (2d Cir.1992) ("Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach or warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach."). The duty to seek clarification of inconsistencies and discrepancies is a preventive measure designed to avoid confusion and needless litigation regarding matters that can be clarified and resolved early in the contracting process. To the extent that the advertising flyer and sale catalogue could be considered inconsistent with each other, plaintiff had a duty to seek clarification from MARC. Having failed to inquire, plaintiff will not be permitted to pursue a claim based on that failure.

The plaintiff also argues that "[i]n any case, the 'disclaimer' . . . itself forms the basis for a breach of warranty claim." Plaintiff's argument centers on this statement in the sale catalogue: "Based on the availability of reliable tests, or observations, efforts have been made to screen sale animals against these and other maladies." Plaintiff argues that this statement is a warranty that "would allow plaintiff to reasonably conclude the government had made a good faith effort to reduce the risk of selling diseased animals." In fact, the defendant did make reasonable efforts to screen sheep against paratubercu-

losis. The parties have stipulated that MARC employed a testing company, Allied Monitor, to test all sheep with the initial ELISA test, and then to retest all sheep scoring positive with the AGID test. In addition, a MARC Herd Health Veterinarian examined each animal for signs of paratuberculosis. Finally, the defendant disclosed to potential buyers that the MARC flocks harbored some level of paratuberculosis. Defendant was in reasonable compliance with the sale catalogue statement that efforts were made to screen the sale sheep for disease based on the availability of tests and clinical observation. For the reasons discussed above, the court does not find a breach of warranty on the part of the government with respect to the sale of sheep to the plaintiff at the MARC's August 14, 1992 auction.

*Consequential Damages*

The plaintiff seeks $57,628,202.00 in direct and consequential damages. However, as discussed below, even if a breach of warranty had been found by the court, the lost profits portion of the damages sought are unsupportable. Plaintiff argues that ram number 806173, purchased from MARC, was infected with paratuberculosis, and that all livestock which came into contact with the ram had to be destroyed. Plaintiff also claims entitlement to lost profits "reasonably expected to be gained through subsequent sale of breeded animals." Plaintiff is seeking damages for the consequence of selling for slaughter both the herd of Texel sheep and the herd of cashmere goats, and damages for the loss of the projected offspring of the sheep and goats. Damages calculations to support plaintiff's position were prepared by Dr. Patrick McMurry, Professor of Economics, Missouri Western State College, St. Joseph, Missouri. The calculations are designed to reflect lost profits from the anticipated sales of sheep and goats for the period 1993—1998. A number of assumptions were employed in the calculations, such as livestock appreciation rates and livestock pricing.

Plaintiff argues that consequential damages are appropriate in this case because "[t]he general rule in common law breach of contract cases is to award damages that will

place the injured party in as good a position as he or she would have been in had the breaching party performed." [9]

In *Wells Fargo Bank v. United States,* 88 F.3d 1012 (Fed.Cir.1996), *cert. denied,* 520 U.S. 1116, 117 S.Ct. 1245, 137 L.Ed.2d 328 (1997), the United States Court of Appeals for the Federal Circuit agreed with the basic rule articulated by plaintiff and went on to state: "However, 'remote and consequential damages are not recoverable in a common-law suit for breach of contract . . . especially . . . in suits against the United States for the recovery of common-law damages, such as the instant case.'" *Id.* at 1021 (quoting *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 524 F.2d 707, 720 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976) (omissions in original)). In *Wells Fargo,* the plaintiff sued for lost profits as a result of the government's refusal to fulfill its promise to guarantee a high risk loan. *Id.* at 1017. The Federal Circuit in *Wells Fargo Bank* denied the claim for lost profits as too uncertain and remote:

> In *Ramsey v. United States,* 121 Ct.Cl. 426, 101 F.Supp. 353 (1951), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952), where the government delayed payment on contracts with the plaintiff, the court, in denying lost profits damages, stated:
>
> > The profits lost from the corporation's over-all business activities, because of its shortage of capital allegedly occasioned by the Government's failure to pay the contract amounts when due, may not be recovered either. It is important to bear in mind that the corporation's claim is not for the anticipated profits of the contracts in question, but is a claim for the anticipated profits of its entire business enterprise. The lost profits of these collateral undertakings, which the corporation was unable to carry out, are too remote to be classified as a natural

result of the Government's delay in payment. . . . "[T]here is a distinction by which all question[s] of this sort can be easily tested. If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. . . . But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit."

*Id.* 101 F.Supp. at 357–58 (quoting *Myerle v. United States,* 33 Ct.Cl. 1, 26 (1897)).

This reasoning is equally applicable to the present case. Here the Court of Federal Claims awarded damages for the profits Wells Fargo allegedly would have made on the additional loans it could have made if the guarantee had been issued. Like the lost profits in *Ramsey,* Wells Fargo's loss of interest on additional loans it allegedly could have made had there been no breach is "too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit."

*Wells Fargo Bank v. United States,* 88 F.3d at 1022–23 (omission in original); *see also San Carlos Irrigation and Drainage Dist. v. United States,* 111 F.3d 1557, 1563 (Fed.Cir.), *reh'g denied* (1997) ("[C]ontract law precludes recovery for speculative damages.") (citations omitted).

In *Wells Fargo,* the plaintiff unsuccessfully claimed lost profits on the additional loans plaintiff could have made if the breach had

---

**9.** The court observes that plaintiff attached, as an exhibit to its brief in opposition to the defendant's motion for summary judgment, "a summary of cases in which consequential damages are awardable in sales of contaminated livestock." No page citations to any language in the cases were included. The opinions in the four-

teen livestock cases cited were issued between 1858 and 1968, and are all state cases, between private parties. The cases do not discuss any of the United States Court of Appeals for the Federal Circuit or United States Court of Claims cases discussed below. The cases do not materially assist plaintiff's case for lost profits.

not occurred.[10] Here, the plaintiff claims lost profits on the additional livestock plaintiff could have produced had the alleged breach not occurred. Both projections are too uncertain and remote under the law. As defendant notes, "[t]he damages sought by Dodson consist of profits that Dodson allegedly would have earned from numerous collateral transactions, consisting of the sale of animals that never existed and may never have come into existence, but that Dodson contends would have been produced and sold profitably if Dodson had not sold its existing animals, from which it had planned to breed all of the other animals." Plaintiff's lost profits depend on events that did not happened and might not have happened. Plaintiff, for example, assumes that other infections would not have invaded and caused destruction of the herd, and that the herd would not be lost to flood or other disaster, such as the one described in Mr. Dodson's March 6, 2000 declaration: "Texel ram number 606015 was purchased by me on August 14, 1992, at the U.S. MARC sheep sale. The same ram drowned on or about July 1, 1993. The Missouri River had flooded my farm where this ram was kept in range. The ram was being transported by boat to safety when the boat operator overturned the boat and the ram drowned. This ram along with 17 ewes were on the boat." Even if the court had found a breach of warranty, which it has not, the plaintiff's claimed lost profits would depend on transactions other than those that occurred between MARC and the plaintiff, and are too uncertain and remote to be part of a damages award.

Defendant also argues that the lost profits sought by the plaintiff were not foreseeable at the time of the auction. The Court of Claims in *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 524 F.2d 707 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976) relied on the United States Supreme Court's description of foreseeability:

> The Supreme Court said in *Globe Refining Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 544, 23 S.Ct. 754, 755, 47 L.Ed. 1171 (1903):
>
> > ... If a contract is broken, the measure of damages generally is the same, whatever the cause of the breach. We have to consider therefore what the plaintiff would have been entitled to recover in that case, and *that depends on what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed,* when the contract was made.
> >
> > This point of view is taken by implication in the rule that "*a person can only be held to be responsible for such consequences as may be reasonably supposed to be in the contemplation of the parties at the time of making the contract.*" ... *The consequences must be contemplated at the time of the making of the contract.* [Emphasis supplied.]

*Northern Helex Co. v. United States,* 524 F.2d at 714–15 (1975) (quoting *Globe Refining Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 544, 23 S.Ct. 754, 47 L.Ed. 1171 (1903) (emphasis and omissions in original)); *see also Prudential Ins. Co. v. United States,* 801 F.2d 1295, 1300 (Fed.Cir.1986) (foreseeability for consequential damages under government contract law is based upon what the parties contemplated as of the time the contract was made), *cert. denied,* 479 U.S. 1086,

---

10. According to the appellate court, which rejected the trial court's reasoning as too uncertain and remote, the trial court in *Wells Fargo* awarded lost profits, in part, under the following reasoning:

> A bank's ability to make loans from the deposits it receives is limited by its capital. For each dollar of Wells Fargo's capital, it could make loans of fifteen dollars. As a result of the Administration's refusal to issue the guarantee and the poor quality of the High Plains loan, Wells Fargo charged off $9.7 million on the loan, which "resulted in an equal reduction to Wells' capital. This capital reduction lessened the ability of Wells to make loans of up to 15 times the amount of the charge-offs—the approximate capital leverage ratio for the bank at the time. The lost income on these allegedly foregone loans was quantified by Wells' expert to be $6,849,000.00, which was based on a 14% average rate of return on Wells' lending business for the preceding years." *Wells Fargo Bank, N.A. [v. United States],* 33 Fed.Cl. [233,] 239 [(1995)].

*Wells Fargo Bank v. United States,* 88 F.3d at 1022.

107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). Thus, even had a warranty on the health of the sheep been breached as the plaintiff contends, this court believes that the plaintiff's plan of action for future lost profits was too speculative and remote to be included as part of an award and could not have been foreseen by the government. Moreover, in light of the court's determination that no warranty was breached by the defendant, the court does not reach damages.

### CONCLUSION

For the foregoing reasons, the court, hereby, **GRANTS** the defendant's motion for summary judgment. The Clerk's Office shall dismiss the complaint and enter judgment for the defendant in accordance with this decision. Each party shall bear its own costs.

**IT IS SO ORDERED.**