**DODSON LIVESTOCK COMPANY,**
Plaintiff–Appellant,

v.

**UNITED STATES, Defendant–Appellee.**

No. 01–5073.

United States Court of Appeals,
Federal Circuit.

March 15, 2002.

Before SCHALL, BRYSON, and DYK, Circuit Judges.

BRYSON, Circuit Judge.

Dodson Livestock Co. appeals from the grant of summary judgment by the Court of Federal Claims in favor of the United States on the ground that there was no breach of warranty by the United States Meat Animal Research Center in connection with the auction and sale of Texel sheep to Dodson Livestock on August 14, 1992. Because there is a question of material fact as to whether MARC's conduct was consistent with representations it made in the auction catalog, we *reverse* the grant of summary judgment and *remand* the case for further proceedings.

I

The appellant, Dodson Livestock Company, is a Missouri corporation specializing in the production of sheep and cashmere goats. In early 1992, Dodson Livestock began to formulate plans to develop a purebred flock of Texel sheep for sale to other breeders. As a result of federal import restrictions, the only source of Texel sheep in the United States in 1992 was the United States Meat Animal Research Center ("MARC") in Clay Center, Nebraska. On July 8, 1992, MARC published a flier advertising the U.S. MARC Annual Surplus Breeding Sheep Sale auction to be held on August 14, 1992. The flier stated: "Enclosed is performance or pedigree information for sale rams and Texel ewes. Full performance information will be available on all the sale ewes the day of the sale. All animals sold will be sound, healthy, guaranteed breeders."

MARC used an independent testing laboratory, Allied Monitor, to screen the sale sheep for paratuberculosis, otherwise known as Johne's disease, using an Enzyme–Linked Immunosorbent Assay ("ELISA") test and an Agar Gel Immunodiffusion ("AGID") test. The ELISA test detects only the presence of antibodies to paratuberculosis; it does not detect the disease itself. ELISA test scores range from 1.0 to 10.0. Allied Monitor considers a score less than 1.4 to be negative, while a score between 1.5–2.0 is considered suspect. The ELISA test was used initially. Any animal whose score exceeded 2.0 on the ELISA test was considered to have tested positive and was subsequently given the AGID test. In addition to the testing by Allied Monitor, a MARC animal health veterinarian individually examined all sheep to be offered for sale at the auction to verify that they did not show clinical signs of paratuberculosis. MARC did not auction any sheep that tested positive for paratuberculosis based on the AGID test or that manifested clinical signs of the disease upon the veterinarian's examination.

Potential buyers, including Dennis Dodson, the president of Dodson Livestock, were provided with a sale catalog when

they registered for the auction. Copies of the catalog also were distributed on site for the buyers' convenience. The catalog contained detailed information regarding individual sheep, such as identification number, date of birth, weight, and fertility rate. It also included a "Remarks" section setting out general purchasing details, such as acceptable forms of payment, arrangement of subsequent transportation, and the condition and health of the sheep at the time of auction. The following paragraph was found under the heading "Condition and Health" in the "Remarks" section of the catalog:

All mature animals were recently treated for internal and external parasites, foot trimmed, and foot bathed. The MARC flocks harbor some level of Paratuberculosis (Johne's) and Ovine Progressive Pneumonia (OPP) infections. Based on the availability of reliable tests, or observations, efforts have been made to screen sale animals against these and other maladies.

MARC's sheep operations manager read the "General" and "Condition and Health" sections of the sale catalog verbatim to the buyers prior to beginning the auction. MARC also notified the buyers as to which sheep were withdrawn due to illness, but it did not inform the buyers of the quantitative test results.

At the auction, Dodson Livestock purchased 18 purebred Texel sheep, including 15 ewes and three rams. Dodson Livestock paid $83,650 for the sheep, including $15,500 for one ram identified as number 806173. Ram number 806173 and five other sheep among the 18 that were sold had tested "suspect" on the ELISA test. The reported ELISA test result for ram number 806173 was 1.5. The AGID test was not performed on that ram or the other five sheep that tested "suspect" on the ELISA test. Two of the sheep purchased by Dodson tested above 2.0 using the ELISA test. After testing positive on the ELISA test, those two sheep were given the AGID test, and their results on those tests were negative.

Approximately a year later, in September 1993, ram number 806173 began to display symptoms of an overall weakened condition that included weight loss, lack of appetite, and diarrhea. A preliminary examination indicated that the ram suffered from paratuberculosis. Upon the recommendation of the treating veterinarian, the ram was euthanized and a subsequent autopsy revealed that the initial diagnosis of paratuberculosis was correct. According to Allied Monitor documents submitted by the parties, once an infected animal is discovered within a flock, two options are recommended: to dispose of the entire flock, or to implement "crisis management" measures including strict sanitation controls and vaccination. Dodson Livestock consulted with sheep veterinarians concerning the effect that the contaminated ram may have had on other Texel sheep and cashmere goats with which the ram came into contact. Because of the risk of further contamination, Dodson Livestock sold both herds in their entirety for slaughter.

On August 16, 1994, Dodson Livestock filed a certified claim with a government contracting officer seeking damages for breach of representations relating to the auction sale of ram 806173. The claim sought $57,628,202 in lost profits from the anticipated sales of sheep and goats. In a letter dated November 29, 1994, the Department of Agriculture rejected the claim on the ground that MARC did not breach any representation because the sale catalog expressly stated that "[t]he MARC flocks harbor some level of Paratuberculosis (Johne's) and Ovine Progressive Pneumonia (OPP) infections."

Dodson Livestock subsequently filed a complaint in the Court of Federal Claims, alleging breach of warranty on the ground that at some time prior to the sale the sheep became infected with paratuberculosis. Because it was unclear whether Dodson Livestock's claim related to the entire flock of Texel sheep purchased at the auction or only to the one infected ram, the government moved for partial dismissal for lack of subject matter jurisdiction. The court held that it lacked subject matter jurisdiction under the Contract Disputes Act ("CDA") to consider Dodson Livestock's claims relating to the other 17 sheep because the breach of warranty claim presented to the contracting officer related only to one ram, and not to the other sheep. *Dodson Livestock Co. v. United States,* 42 Fed. Cl. 455, 462 (1998). The court also held that it could not consider Dodson Livestock's claim that the United States breached an alleged duty to disclose pre-auction test results because that claim was not presented to the contracting officer as required by the CDA. *Id.* at 463.

The Court of Federal Claims subsequently granted the government's motion for summary judgment on the ground that MARC did not warrant that the sheep sold at the auction would be healthy and free of paratuberculosis. *Dodson Livestock Co. v. United States,* 48 Fed. Cl. 551 (2001). Dodson Livestock now appeals to this court.

## II

The primary focus of this appeal is on the following sentence in the "Condition and Health" section of the auction catalog: "Based on the availability of reliable tests, or observations, efforts have been made to screen sale animals against these and other maladies." Dodson Livestock argues that in light of that sentence and the earlier representation in the auction flier that "[a]ll animals sold will be sound, healthy,

guaranteed breeders," the only appropriate action the government could have taken after discovering paratuberculosis in the MARC herd was to destroy the herd or to implement elaborate "crisis management" measures. We disagree. The earlier representation that the animals were "sound" and "healthy" was a general statement that was effectively qualified by the disclosures in the auction catalog. The auction catalog disclosed the presence of paratuberculosis in the herd and represented only that MARC had taken steps, consistent with reliable tests, to ensure that the sale animals would not be infected. If that representation was accurate, the government violated no duty to Dodson Livestock by selling the sheep, even if it turned out that one or more of the sheep was infected with paratuberculosis that had escaped detection prior to the sale.

The critical question is thus whether the government's representation was accurate. That representation plainly would have been accurate if, for example, reliable tests had shown that all the sale animals tested negative for paratuberculosis, either in the initial testing or in follow-up testing. That, however, is not what happened. Instead, six of the sheep, including ram number 806173, tested "suspect" under the ELISA test but were nonetheless offered for sale, apparently without any follow-up testing. The government's apparent failure to take any further action with respect to the animals that tested "suspect" raises a factual question as to whether its representation that "[b]ased on the availability of reliable tests, or observations, efforts have been made to screen the sale animals" for paratuberculosis was misleading.

Although the ELISA and AGID tests were developed for cattle, the parties have stipulated that they are useful in determining the presence of paratuberculosis in sheep. It therefore seems clear that those

tests may be considered "reliable" within the meaning of the disclosure in the auction catalog. What is unclear is whether the government's conduct with respect to the five sheep that tested "suspect" was consistent with its representation that, based on those tests or observations, efforts were made to screen the sale animals.

Evidence in the record suggests that MARC may have deviated from the recommended ELISA testing protocol with respect to the animals that tested "suspect," including ram number 806173. Dodson Livestock introduced evidence that the Allied Monitor ELISA testing protocol recommended that sheep that test "suspect" on the ELISA test should be retested in four to six months, but that ram 806173 was not retested under the ELISA test or given the AGID test. If MARC deviated from the recommended protocol, that raises the question whether MARC's conduct comported with its representation that "efforts have been made to screen sale animals" based on the availability of reliable tests or observations.

The Court of Federal Claims concluded that "the [government] did make reasonable efforts to screen sheep against paratuberculosis" and that "[the government] was in reasonable compliance with the sale catalogue statement that efforts were made to screen the sale sheep for disease based on the availability of tests and clinical observation." *Dodson Livestock Co. v. United States*, 48 Fed. Cl. at 563. Based on the evidence offered during the summary judgment proceedings, we believe that fact-based conclusion is premature. The evidence before the trial court was sufficient to raise a material factual question as to whether the government's representation was misleading, i.e., whether a person in the business of purchasing sheep at auction would understand the government's representation to indicate that reli-

able testing procedures had been followed with respect to all the sale animals and, if so, whether the government departed from those procedures in a material way with respect to ram 806173. While we do not suggest that the government's representation was necessarily misleading, the evidence in the record bearing on that issue raises a genuine issue of material fact precluding the grant of summary judgment. Accordingly, we reverse the summary judgment and remand the case to the trial court for further proceedings.