**DODSON LIVESTOCK COMPANY,**
Plaintiff,

v.

**UNITED STATES, Defendant.**

No. 05–771C.

United States Court of Federal Claims.

July 30, 2004.

806173. *Dodson Livestock Co. v. United States,* 48 Fed.Cl. 551, 556 (2001).[1] The United States Court of Appeals for the Federal Circuit remanded the case to this court, finding that a genuine issue of material fact existed with regard to whether the government's representation in the auction catalog was misleading. *Dodson Livestock Co. v. United States,* 30 Fed.Appx. 989, 993 (Fed. Cir.2002). The trial court subsequently held an evidentiary hearing and the parties submitted post-hearing briefs.

Michael P. Guta, Oakland, California, for the plaintiff.

Shalom Brilliant, Senior Trial Counsel; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. L. Benjamin Young, United States Department of Agriculture, Washington, D.C., of counsel.

## OPINION

HORN, Judge.

### BACKGROUND

Plaintiff Dodson Livestock Company, a Missouri corporation specializing in the production of sheep and goats, originally brought this action against the United States for an alleged breach of warranty regarding sheep purchased at the United States Meat Animal Research Center (MARC) annual auction in Clay Center, Nebraska. Company owner Dennis Dodson alleges that one ram, number 806173, which Mr. Dodson purchased at the auction, became infected with paratuberculosis despite a statement in the auction catalogue that "reliable tests" were used to screen the auction animals prior to sale. Mr. Dodson alleges that the possibility of contamination forced him to destroy his entire Texel flock, thus frustrating his plans to make Dodson Livestock a leader in the breeding of Texel sheep. The court granted defendant's motion for summary judgment on the breach of warranty claim regarding ram number

### FINDINGS OF FACT

Dodson Livestock is a Missouri corporation specializing in the production of sheep and goats. In 1992, Dodson Livestock stated that it had a thriving cashmere goat business and had gained a reputation as a breeder of quality purebred sheep and goats. Company owner Dennis Dodson stated that he intended to develop a purebred Texel flock for sale to other breeders of both purebred and commercial flocks.

As a result of federal import restrictions, the only source of Texel sheep in the United States in 1992 was the United States Meat Animal Research Center (MARC) in Clay Center, Nebraska. On July 8, 1992, MARC published a flyer advertising the United States MARC Annual Surplus Breeding Sheep Sale auction to be held on August 14, 1992. The flyer stated: "[e]nclosed is performance or pedigree information for sale rams and Texel ewes. Full performance information will be available on all the sale ewes the day of the sale. All animals sold will be sound, healthy, guaranteed breeders."

MARC used an independent testing laboratory, Allied Monitor, to screen the sale sheep for paratuberculosis, otherwise known as Johne's disease, and other common maladies. Allied Monitor used an Enzyme–Linked Immunosorbent Assay (ELISA) test and an Agar Gel Immunodiffusion (AGID) test, both of which detect the presence of antibodies rather than the disease itself. The ELISA test scores range from 1.0 to 10.0. According to an Allied Monitor docu-

---

1. Pertinent facts and findings from this court's earlier opinion are incorporated into this opinion, together with the additional findings of fact which resulted from the most recent hearing.

ment titled "Guidelines: Interpretation and Use of Allied ELISA Test Results," which is designed for cattle testing, a score of 1.0 to 1.4 is considered negative; a score of 1.5 to 2.0 is considered suspect; and a score of 2.1 to 10.0 is considered positive. Allied Monitor utilized the ELISA test as a pre-screening measure. Animals that scored positive on the ELISA test were subsequently tested with the AGID test for confirmation. Animals scoring suspect on the ELISA test were recommended to be retested in four to six months. In addition to the testing conducted by Allied Monitor, a MARC herd health veterinarian examined all animals to be offered for sale in the 1992 auction and verified that they were free of clinical signs of paratuberculosis. Any animal testing positive for paratuberculosis based on the AGID test, or manifesting clinical signs of the disease observed upon professional examination, was not offered for sale in the 1992 auction.

Potential buyers, including Dennis Dodson, the President of Dodson Livestock, were provided with a sale catalogue when they registered for the MARC auction. Copies of the catalogue also were distributed at the sale site for the buyers' convenience. The catalogue contained detailed information for the individual sheep, such as identification number, date of birth, weight, and fertility rate. It also included a "*REMARKS*" section setting out general sheep purchasing details, such as acceptable forms of payment, arrangement of subsequent transportation, and the health condition of the sheep at the time of auction. The following statement was located under the heading "*Condition and Health*" in the "*REMARKS*" section of the catalogue:

> The MARC flocks harbor some level of Paratuberculosis (Johne's) and Ovine Progressive Pneumonia (OPP) infections. Based on the availability of reliable tests, or observations, efforts have been made to screen sale animals against these and other maladies.

In addition, an auction supervisor read the "*General*" and "*Condition and Health*" sections of the sale catalogue verbatim to the buyers prior to beginning the sale. Although the buyers were not provided with the quantitative results of the screening tests, they were notified of which sheep had been withdrawn due to illness. The parties have stipulated that Dennis Dodson received the catalogue the night before the auction, but that he did not read the "*REMARKS*" section.

At the auction, Dodson Livestock purchased eighteen purebred Texel sheep, including fifteen ewes and three rams. Mr. Dodson paid $83,650.00 for the sheep, including $15,500.00 for one ram identified as number 806173. Mr. Dodson was unaware that two of the eighteen sheep he purchased had tested positive on the ELISA test; however, their subsequent AGID tests had returned negative results. Ram number 806173 and five other sheep had tested "suspect" on the initial ELISA test in July, 1992, and therefore, according to the Allied Monitor protocol, were not given a confirmatory AGID test. Allied Monitor guidelines for cattle recommended that "suspect" animals be retested in four to six months. Ram number 806173 was sold to Mr. Dodson the next month after the July, 1992 test, on August 14, 1992. Therefore, at the time that Allied Monitor guidelines would have recommended retesting "suspect" cattle, the "suspect" ram already was in the possession of Mr. Dodson.

In September, 1993, approximately one year after the MARC auction, plaintiff stated that ram number 806173 began to display symptoms of an overall weakened condition that included weight loss, lack of appetite, and diarrhea. The plaintiff claims that a preliminary examination, conducted at the Department of Clinical Sciences, Veterinary Medical Teaching Hospital at Kansas State University, as well as a serology report introduced at the remand hearing, indicated that the ram suffered from paratuberculosis. After the preliminary examination, the treating veterinarian recommended that the ram be euthanized. Dodson Livestock consulted with sheep veterinarians concerning the effect that the contaminated ram may have had on other Texel sheep and cashmere goats with which it had come in contact, and, due to the risk of contamination, sold for slaughter both herds in their entirety. According to plaintiff, once an infected animal is discovered within a flock, the recommended course

of treatment is to destroy or to sell for slaughter the entire flock.

On August 16, 1994, Dodson Livestock filed a certified claim with a Department of Agriculture contracting officer seeking $57,628,202.00 in lost profits from the anticipated sheep and goat sales. The introduction to the claim stated that it "concern[ed] damages sustained by Dodson Livestock because of breach of representations concerning Texel sheep purchased by Dodson Livestock at [the auction]." The claim to the contracting officer alleged that all available evidence indicated that ram number 806173 had been infected with paratuberculosis at the time of sale:

> The information provided to Dodson Livestock at the August 14, 1992 sale indicated that the ram had a birth date of April 4, 1988, making it four years old as of the date of sale. Scientific evidence indicates that it is unlikely for a ram of this age to contract paratuberculosis, as opposed to becoming a carrier. Additionally, information provided at the auction sale indicated that all Texel sheep sold at the sale had been quarantined at the U.S. MARC facility prior to the sale. Accordingly, the only conclusion is that the ram was infected with paratuberculosis upon its sale to Dodson Livestock.

After outlining the alleged factual circumstances behind the sheep purchase, the claim alleged that "[t]he conduct of U.S. MARC in selling the ram infected with paratuberculosis constitute[d] a breach of its representation that the animal would be a sound, healthy and guaranteed breeder," and "a breach of the implied warranty of merchantability in that it is expected that such an animal would pass within the industry without paratuberculosis."

In a letter dated November 29, 1994, the Department of Agriculture responded to Dodson Livestock and issued a final rejection of its claim. The letter read in pertinent part as follows:

> For the reasons expressed below, this claim is denied in its entirety: first, MARC did not breach any representation concerning Texel sheep purchased by Dodson Livestock at the August 14, 1992, auction because the sale catalog expressly stated that "The MARC flocks harbor some level of Paratuberculosis (Johne's) and Ovine Progressive Pneumonia (OPP) infections."; second, MARC did not breach any implied warranty of merchantability, if such existed, because MARC had effectively disclaimed any such implied warranty of merchantability by making the above-mentioned disclaimer in the sale catalogue.

Dodson Livestock subsequently filed a complaint in this court. Thereafter, it became apparent that the parties disagreed as to whether Dodson had stated a claim with respect to the entire flock of Texel sheep purchased at the auction, or only as to the one infected ram. On May 30, 1998, the defendant filed a motion to dismiss "so much of plaintiff's complaint as may be construed to assert a cause of action other than for breach of warranty in the sale of the one ram." The defendant argued that this court did not have jurisdiction to hear claims beyond the single ram or relating to MARC's alleged failure to inform Dodson Livestock of any test results prior to the auction because such claims had not been submitted to the contracting officer as required by the Contract Disputes Act. The court granted the defendant's motion to dismiss, without prejudice, all claims except the plaintiff's breach of warranty claim for ram number 806173. *Dodson Livestock Co. v. United States*, 42 Fed.Cl. 455, 463 (1998). The court noted section 605(a) of the Contract Disputes Act, which requires that claims brought under the Contract Disputes Act first be submitted in writing to the contracting officer for a final decision. *Id.* at 460 (citing 41 U.S.C. § 605(a) (1994)). By the dismissal, without prejudice, of claims other than a breach of warranty for ram number 806173, the plaintiff was afforded the opportunity to present its other claims and theories of recovery to the cognizant contracting officer pursuant to 41 U.S.C. § 605(a), and, if denied or unanswered by the contracting officer, to refile those claims in the United States Court of Federal Claims.

On March 19, 1999, plaintiff submitted a second claim to the contracting officer, alleging that three rams and at least four of the

fifteen ewes sold by the government to the plaintiff were infected with paratuberculosis in breach of warranty, and further alleged that the government had a duty to disclose the test results reflecting paratuberculosis. The claim attached the original August 16, 1994 claim, including the original certification of the claimed amount of $57,628,202.00. The contracting officer declined to render a final decision on the claim, reasoning that since the amount of the second claim was the same as the amount of the first claim, he lacked "authority to render a decision while litigation over the one ram seeking the same monetary damages is still pending" in the Court of Federal Claims. The contracting officer also noted the absence of a fresh certification of the claimed amount. The applicable Federal Acquisition Regulation (FAR) stated that "a written demand or written assertion by the contractor seeking the payment of money exceeding $100,000 is not a claim under the Contract Disputes Act of 1978 until certified as required by the Act and [FAR] 33.207." 48 C.F.R. § 33.201 (1998); see Case, Inc. v. United States, 88 F.3d 1004, 1009 (Fed.Cir.1996) (citing Ball, Ball & Brosamer, Inc. v. United States, 878 F.2d 1426, 1428 (Fed.Cir.1989) (where a claim is not properly certified, there is no valid claim for a contracting officer to decide)).

On March 15, 2000, the plaintiff filed a third claim with the contracting officer, reproducing the second claim, but adding another certification in the original amount of $57,628,202.00. The contracting officer did not issue a final decision, but forwarded the claim to agency counsel. This last claim is "deemed denied" through the passage of more than sixty days from the presentation of the claim to the contracting officer. See 41 U.S.C. § 605(c)(2), (5) (2004) (Failure of the contracting officer to issue a decision on a claim within sixty days "will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim . . . ."). On January 6, 2000, prior to this third rejection by the contracting officer, the plaintiff had filed an amended complaint with this court which attempted to add a damages claim for the entire flock of Texel sheep purchased at the auction, as well as a claim alleging that MARC should have disclosed to buyers the quantitative results of the screening tests performed on the sale animals. Both of these claims were included in the second claim filed with the contracting officer. However, because the contracting officer rejected the plaintiff's second administrative claim for lack of proper certification, the plaintiff's damages claim for more than one ram, i.e. the entire Texel flock purchased at the auction, is not jurisdictionally before this court because the claim was not properly presented to the contracting officer, despite the amended complaint that plaintiff filed following the second claim to the contracting officer. See 41 U.S.C. § 605. No amended complaint was filed in this court following the deemed denial of plaintiff's properly certified third claim to the contracting officer. The court also notes that the Federal Circuit recognized this court's earlier dismissal of plaintiff's claims except with respect to ram number 806173, and did not question that decision. Dodson Livestock Co. v. United States, 30 Fed.Appx. at 992. Moreover, the discussion below of the remaining issues in this case, which are properly before this court, renders moot any additional issues.

On February 2, 2001, this court granted defendant's motion for summary judgment on the pending breach of warranty claim for ram number 806173. Dodson Livestock Co. v. United States, 48 Fed.Cl. at 566. The court held that the government had not warranted that the sheep sold at the auction would be healthy and free of paratuberculosis; rather, the language in the "Condition and Health" section of the sale catalogue warned of "some level of Paratuberculosis" in the MARC flocks. Id. at 562. The court stated that "some level" should not be construed so narrowly as to mean that all sheep had tested negative, and noted that by way of contrast, the same section of the sale catalogue contained language that all rams "are serologically negative for Brucella ovis . . . ." Id. The court stated that the more specific statement in the auction catalogue, warning buyers of the presence of paratuberculosis and informing them that screening efforts had been made, prevailed over the

earlier, more general statement that "[a]ll animals sold will be sound, healthy, guaranteed breeders" in the advertising flyer. *Id.* at 559. The court found that the defendant, having employed an independent testing company and a veterinarian to screen animals for paratuberculosis, was in reasonable compliance with the sale catalogue statement that efforts had been made to screen the sale sheep for disease based on the availability of tests and clinical observation. *Id.* at 563.

The United States Court of Appeals for the Federal Circuit found the grant of summary judgment to be premature and reversed, based on "a question of material fact as to whether MARC's conduct was consistent with representations it made in the auction catalog." *Dodson Livestock Co. v. United States,* 30 Fed.Appx. at 990. The Federal Circuit decision focused primarily on the statement in the auction catalog that, "[b]ased on the availability of reliable tests, or observations, efforts have been made to screen sale animals against these and other maladies." *Id.* at 992. The court defined the key issue as follows:

whether the government's representation was misleading, i.e., whether a person in the business of purchasing sheep at auction would understand the government's representation to indicate that reliable testing procedures had been followed with respect to all the sale animals and, if so, whether the government departed from those procedures in a material way with respect to ram 806173.

*Id.* at 993. The Federal Circuit, however, stated that since the joint stipulation labeled the ELISA and AGID tests as "useful" in determining the presence of paratuberculosis in sheep, the tests also could be considered "reliable" for sheep within the meaning of the disclosure in the auction catalog, despite the fact that the tests had been developed for cattle. *Id.* at 992. The Federal Circuit stated that:

The auction catalog disclosed the presence of paratuberculosis in the herd and represented only that MARC had taken steps, consistent with reliable tests, to ensure that the sale animals would not be infected. If that representation was accurate, the

government violated no duty to Dodson Livestock by selling the sheep, even if it turned out that one or more of the sheep was infected with paratuberculosis that had escaped detection prior to the sale. *Id.* In its decision to reverse the grant of summary judgment for the defendant, the Federal Circuit expressed a concern regarding this court's fact-based conclusion that the defendant was in reasonable compliance with the auction catalog representation. The Federal Circuit's concern was generated by evidence the court identified in the record suggesting that MARC may have deviated from testing protocol with respect to the "suspect" ram number 806173 by not retesting it within four to six months. *Id.* at 993.

In accordance with the remand and reversal of summary judgment, this court held an evidentiary hearing to determine, as instructed by the Federal Circuit, whether the defendant's representation that, "[b]ased on the availability of reliable tests, or observations, efforts have been made to screen the sale animals" for paratuberculosis was misleading. *Id.* at 992.

The plaintiff, however, offered only limited evidence to the court. At the hearing following remand, Dennis Dodson, the President of Dodson Livestock, was one of two testifying witnesses for the plaintiff. Dr. Duane Keisler, a Reproductive Physiologist and Beef and Sheep Production and Management Specialist at the University of Missouri who was qualified as an expert in "production and management of sheep," also testified for the plaintiff. In response, the defendant similarly offered two witnesses, Dr. Gary S. Ross, a former MARC veterinarian who was involved in the pre-auction testing of the auctioned animals, and who was qualified as an expert in "the area of veterinar[y] medicine, specializing in livestock including sheep," and Michael H. Wallace, Sheep Operations Manager for the MARC facility in Clay Center, Nebraska.

The witnesses offered conflicting testimony. Plaintiff's witness, Dr. Keisler, testified that the ELISA and AGID tests were not valid because they only detected the paratuberculosis antibodies, rather than the disease itself, and that the fecal culture test of the

actual bacteria was a far more reliable option. Defendant's expert, Dr. Ross, however, stated that although the fecal culture test was considered the "gold standard" for cattle, it was not yet commercially available and not yet found to be reliable for testing sheep. In light of the available tests at the time of the auction, Dr. Ross stated that the ELISA and AGID tests were just as reliable as any other alternatives. Furthermore, Dr. Ross and Mr. Wallace provided testimony, as discussed more fully below, that ram number 806173 might not have been infected with paratuberculosis at the time of the auction. Dr. Keisler and Dr. Ross also disagreed as to whether Allied Monitor had utilized proper testing methods to test the sale animals. Dr. Keisler testified that the methods were not valid because Allied Monitor had only tested a subset of the population and had not retested "suspect" animals. Dr. Ross countered Dr. Keisler's statement by testifying that the methods used were logical and consistent with standard protocol, also noting that the recommendation to retest "suspect" animals applied to cattle, not to sheep.

Plaintiff, Dennis Dodson, offered testimony which was at times hard to follow and conflicted with testimony offered by Michael Watson, MARC sheep operations manager, regarding the conditions in which the flock was living, caused by a flood that forced Mr. Dodson to transport his sheep to another farm. Dr. Ross testified that if the sheep had been wading in ankle-deep water as stated by Mr. Watson, then the animals could have become infected with coccidiosis and displayed clinical signs similar to those of paratuberculosis. Dr. Ross also pointed out that the "Urinalysis or Fecal Request" report in the record indicated the presence of coccidia. Dr. Ross testified that the serology report presented by the plaintiff as evidence of the paratuberculosis infection gave no indication of what tests were used or what facility had administered the tests. He also suggested that the report might not even address ram number 806173, since the age of the ram on the serology report did not match the correct age of ram number 806173.

Finally, defendant's expert witness Dr. Ross provided testimony concerning the drafting of the auction catalog statement at issue. He testified that he had participated in the discussion of what to include in the catalog statement and that he was responsible for one of the edits prior to release regarding the breadth of the critical statement. Dr. Ross testified that he had removed the word "all" from the original phrase "all efforts have been made to screen sale animals," finding the original version of the statement to imply more than what was intended. As noted above, the final version of the catalog statement read, "efforts have been made to screen sale animals . . . ."

After weighing the probative value and credibility of the testimony offered by the opposing parties, the court finds on remand that (1) the MARC representation in the auction catalog was a disclosure to potential buyers, not a contractual warranty; (2) the ELISA and AGID tests for cattle were among the most reliable tests available for testing sheep for paratuberculosis at the time of the auction; (3) Allied Monitor's testing methods were reasonably consistent with whatever limited protocol, if any, could be transferred from cattle to sheep testing; and (4) although not necessary to the conclusion reached below, evidence that ram number 806173 was infected with paratuberculosis was inconclusive because serious doubt was raised at the hearing as to whether the test results recorded on the serology report offered by the plaintiff actually addressed ram number 806173, purchased by Dennis Dodson at the 1992 MARC auction.

## DISCUSSION

The United States Court of Appeals for the Federal Circuit has defined the central issue on remand to be whether the defendant's representation in the auction catalog that, "[b]ased on the availability of reliable tests, or observations, efforts have been made to screen sale animals against these and other maladies," was misleading. *Dodson Livestock Co. v. United States*, 30 Fed. Appx. at 992. In particular, the Federal Circuit has directed this court to determine whether MARC departed from reliable testing procedures with respect to ram number 806173. *Id.* at 993. Other issues that the

plaintiff raised in its post-trial brief, including the number of sheep addressed in the claim and whether the Allied Monitor tests were reliable, have been resolved by prior decisions in this case and are not presently at issue. The Federal Circuit has not challenged this court's previous determination that the plaintiff's claim addresses only the ram identified by plaintiff as 806173, as opposed to the entire Texel flock purchased at the auction, *Dodson Livestock Co. v. United States*, 42 Fed.Cl. at 461, and the plaintiff has not cured the jurisdictional defect. Furthermore, the Federal Circuit has determined that the ELISA and AGID tests "may be considered 'reliable' within the meaning of the disclosure in the auction catalog." *Dodson Livestock Co. v. United States*, 30 Fed. Appx. at 992–93.

The plaintiff, Dodson Livestock, has the burden of proving that the government acted improperly by drafting a misleading representation or by breaching a warranty to buyers at the auction. *See Technical Assistance Int'l v. United States*, 150 F.3d 1369, 1373 (Fed.Cir.1998) ("The party alleging a breach of contract bears the burden of proving the breach.") (citing *Perry v. Dep't of the Army*, 992 F.2d 1575, 1577 (Fed.Cir.1993)). In its opinion remanding the case to this court, the Federal Circuit raised questions regarding the accuracy of the government's representation in the auction catalog and "whether MARC's conduct was consistent with representations it made in the auction catalog." *Dodson Livestock Co. v. United States*, 30 Fed.Appx. at 990, 993. The Federal Circuit was careful to state, however, that "while we do not suggest that the government's representation was necessarily misleading, the evidence in the record bearing on that issue raises a genuine issue of material fact precluding the grant of summary judgment," thus, isolating its concerns to the issue of summary judgment, rather than making a finding that would shift the burden of going forward with the evidence from the plaintiff to the defendant. *Id.* at 993. Therefore, on the issue currently before the court, the plaintiff retains the burden of proof and the defendant does not have the burden of going forward with the evidence until the plaintiff establishes a *prima facie* case. *See AK Steel*

*Corp. v. United States*, 192 F.3d 1367, 1381 (Fed.Cir.1999) ("Although the burden of production initially was on Commerce to establish a prima facie case for imposing a countervailing duty, the burden of production then shifted to the exporter to come forward with sufficient evidence to rebut the prima facie case."); *see also Creswell Trading Co. v. United States*, 15 F.3d 1054, 1060 (Fed. Cir.), *reh'g denied* (1994). If the plaintiff had presented a *prima facie* case showing that the government had drafted a misleading representation or had breached a warranty to buyers at the auction, then the government would have had the duty of coming forward with evidence to demonstrate that MARC's testing procedures were consistent with the representations it made in the catalog. The plaintiff, however, did not present a *prima facie* case at the remand hearing. Despite having the burden of proof, the plaintiff offered only limited testimony and failed to prove any breach of warranty or misrepresentation that reliable testing procedures had been properly followed to screen sale animals. Furthermore, the plaintiff failed to prove definitively that ram number 806173 was infected with paratuberculosis at the time it was purchased by Dodson at the 1992 MARC auction.

## I. Plaintiff's Breach of Warranty Claim

In its post-trial brief, plaintiff claims that MARC's representation that, "[b]ased on the availability of reliable tests, or observations, efforts have been made to screen sale animals against these and other maladies" constituted a contractual warranty which the defendant breached when it sold the allegedly paratuberculosis-infected ram number 806173 at the MARC annual auction. Although the government never concedes that this representation constituted a warranty as plaintiff alleges, both parties are in agreement that in order to recover for a breach of warranty, the plaintiff carries the burden of alleging and proving, "(1) that a valid warranty existed, (2) the warranty was breached, and (3) plaintiff's damages were caused by the breach." *Hercules Inc. v. United States*, 24 F.3d 188, 197 (Fed.Cir.

1994), aff'd, 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996); *San Carlos Irrigation & Drainage Dist. v. United States,* 877 F.2d 957, 959 (Fed.Cir.), *reh'g denied* (1989).

The representation at issue in the MARC auction catalog does not constitute a contractual warranty. The language of the catalog representation did not warrant that all animals sold would be free of paratuberculosis, nor that the screening tests utilized by Allied Monitor would be foolproof. Instead, "a person in the business of purchasing sheep" should have understood the language of the government's representation in the catalog to read as a disclosure or a disclaimer, accompanied by a statement of intent to screen sheep for paratuberculosis prior to sale. The 1994 letter from the Department of Agriculture issuing a final rejection of Dodson's original claim labeled the statement as a "disclaimer," not a warranty. *Dodson Livestock Co. v. United States,* 48 Fed.Cl. at 554. Furthermore, after reviewing the facts, the United States Court of Appeals stated that "[t]he auction catalog disclosed the presence of paratuberculosis in the herd and represented only that MARC had taken steps, consistent with reliable tests, to ensure that the sale animals would not be infected." *Dodson Livestock Co. v. United States,* 30 Fed.Appx. at 992.

"[F]or a government representation...to be binding as a contractual obligation, it must have been in the form of an undertaking rather than a mere prediction or statement of opinion or intention." *Nat'l By–Prods., Inc. v. United States,* 186 Ct.Cl. 546, 560, 405 F.2d 1256, 1264 (1969). Referring to the language in *Nat'l By–Prods., Inc. v. United States* quoted above, the court in *Hanlin v. United States* stated, "[t]he statement is a recognition of the fact that when the Government intends to contract, it generally does so through the formalities of a written agreement." *Hanlin v. United States* 50 Fed.Cl. 697, 700 (2001), *aff'd,* 316 F.3d 1325 (Fed.Cir.2003). The representation in the MARC auction catalogue, which is properly read as a disclosure or disclaimer, did not contain the formalities of a contractual warranty.

Had the MARC representation in the auction catalog constituted a contractual warranty, as plaintiff alleges, the representation must have been "intended precisely to relieve the promisee of any duty to ascertain the facts for [them]sel[ves]. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Dale Constr. Co. v. United States,* 168 Ct.Cl. 692, 699, 1964 WL 8611 (1964). The critical words of the auction catalog do not meet the requirements of warranty language. In the sale catalog, defendant put potential buyers on notice that the MARC herds harbored some level of paratuberculosis. In an earlier opinion, this court stated that, "[t]o the extent that the advertising flyer and sale catalogue could be considered inconsistent with each other [on the issue of whether there would be any paratuberculosis infection in the herd], plaintiff had a duty to seek clarification from MARC." *Dodson Livestock Co. v. United States,* 48 Fed.Cl. at 563. The defendant did not express in the auction catalog any intention to relieve buyers of their duty to ascertain facts for themselves, nor to indemnify them for any losses relating to the representation in the catalog. The defendant "represented only that MARC had taken steps, consistent with reliable tests, to ensure that the sale animals would not be infected." *Dodson Livestock Co. v. United States,* 30 Fed.Appx. at 992. Therefore, the court finds that the MARC representation in the auction catalog that "[b]ased on the availability of reliable tests, or observations, efforts have been made to screen sale animals against" paratuberculosis did not constitute a warranty.

## II. Accuracy of the Auction Catalog Representation

■ Even absent a warranty from the defendant to those who purchased animals at the 1992 auction, however, the Federal Circuit's question remains as to "whether its [MARC's] representation that '[b]ased on the availability of reliable tests, or observations, efforts have been made to screen the sale animals' for paratuberculosis was misleading." *Dodson Livestock Co. v. United States,* 30 Fed.Appx. at 992. Testimony presented by the defendant at the evidentiary hearing

upon remand indicates that the government had considered the accuracy of its catalog representation prior to issuing the statement to potential buyers. According to Dr. Ross, an expert witness for the defendant and former MARC veterinarian, the original, unedited statement actually read, "Based on the availability of reliable tests, or observations, all efforts have been made to screen sale animals against these and other maladies." When questioned about his decision to edit out the word "all," Dr. Ross replied that "I think it [the original statement including the word 'all'] implies something more than what was intended to be stated."

With regard to the scope of the auction catalog representation, the Federal Circuit has already determined that:

> [t]he auction catalog disclosed the presence of paratuberculosis in the herd and represented only that MARC had taken steps, consistent with reliable tests, to ensure that the sale animals would not be infected. If that representation was accurate, the government violated no duty to Dodson Livestock by selling the sheep, even if it turned out that one or more of the sheep was infected with paratuberculosis that had escaped detection prior to sale.

*Dodson Livestock Co. v. United States,* 30 Fed.Appx. at 992. In evaluating the accuracy of MARC's catalog representation, this court must consider a number of factors, including the reliability of the ELISA and AGID tests themselves, and the validity of the testing methods used in screening the auction animals prior to sale.

### A. Reliability of ELISA and AGID Tests

The Federal Circuit stated in its opinion with regard to the ELISA and AGID tests that "the tests may be considered 'reliable' within the meaning of the disclosure in the auction catalog" despite their development for cattle, because the tests are "useful" in detecting paratuberculosis in sheep. *Id.* at 993. The trial court's findings from the evidentiary hearing following remand lend further support to this determination by demonstrating that the ELISA and AGID tests

were among the most reliable tests available for testing sheep at the time of the auction.

When questioned about the reliability of the ELISA and AGID tests, plaintiff's expert witness, Dr. Keisler, suggested that the fact that those tests detected the presence of antibodies rather than the disease itself was problematic, and noted further that such antibody-tests were "developed for the purpose of aiding in the screening, but not as a discriminator. ... Is it a reliable test? And as I said yesterday, as a single determination, then the answer would be absolutely not." Dr. Keisler testified that the fecal culture test, in contrast, is a reliable test because it does not yield false negatives. "[I]f that test determines that the animal is carrying the bacteria, if you're able to culture, then that is an absolute positive."

The defendant's expert witness, Dr. Ross, however, testified that the ELISA and AGID tests were just as reliable as any other tests available at the time of the auction for testing sheep for paratuberculosis, and furthermore, that it was a more reliable test than the fecal culture test, which was not yet commercially available at the time.

> [MR. BRILLIANT]: Dr. Keisler mentioned in his testimony about a fecal culturing method that was presented to the scientific community in 1991. Are you familiar with that?
>
> [DR. ROSS]: Yes.
>
> [MR. BRILLIANT]: Was that fecal culturing method as relating to sheep, commercially available in 1992?
>
> [DR. ROSS]: No, it was not.
>
> [MR. BRILLIANT]: Is it commercially available today?
>
> [DR. ROSS]: My understanding is that it's just becoming available through the diagnostic laboratory at Cornell University.
>
> [MR. BRILLIANT]: Just becoming available, how recently do you think that was?
>
> [DR. ROSS]: Probably as we speak.

Dr. Ross further testified that although the fecal culture test may have been considered the "gold standard" of tests in cattle, the same did not hold true for testing sheep.

[DR. ROSS]: [I]t was indicated in the literature and I think it can be easily demonstrated that the fecal culture, at that time, had a sensitivity of about ten to 20 percent in sheep. So, why would I use the test that maybe has ten or 20 percent when I could use a test that had maybe 40 percent sensitivity, such as the AGID or the ELISA?

[MR. BRILLIANT]: So you thought that the AGID and ELISA test was a better test than the fecal culture test?

[DR. ROSS]: Yes.

The Federal Circuit's determination that the ELISA and AGID tests could be "considered 'reliable' within the meaning of the disclosure in the auction catalog," *Dodson Livestock Co. v. United States*, 30 Fed.Appx. at 993, together with the credible testimony of defendant's expert Dr. Ross regarding the lack of commercial availability and low percentage accuracy of the fecal culture method for testing sheep, establish that the ELISA and AGID tests in combination were among the most reliable tests available for the purposes of screening sheep for paratuberculosis at the time of the MARC auction.

**B. Validity of Testing Methods and Adherence to Standard Procedures**

In evaluating the accuracy of the defendant's auction catalog representation, the court also must consider the validity of the testing procedures that Allied Monitor employed with regard to ram number 806173. Dr. Keisler, expert witness for the plaintiff, testified that "there's no evidence that these tests [the tests administered by Allied Monitor] are valid" because the samples had not been assayed in duplicate, and because the lack of positive results provided no evidence that the tests were actually working.

[MR. GUTA]: Now, based on your review of Exhibits 5 and 6 [the Allied Monitor test guidelines and results], did you come to an opinion as to the validity of the tests administered by Allied Monitor at MARC's behest?

[DR. KEISLER]: Yes. My opinion is that there's no evidence that these tests are valid.

[MR. GUTA]: I see. And what about these exhibits gives you that opinion?

[DR. KEISLER]: Number one, they have not been repeated. I don't see duplicate determinations .... I see no evidence that an ovine or ovine serum was used .... I don't see any evidence of any positives. So if I never come up with a positive, how do I know that the test is working? All I know is that I have low levels.

Dr. Keisler further criticized the fact that less than half of the sheep offered for sale were tested for paratuberculosis. After confirming that Allied Monitor had only tested 288 sheep, Dr. Keisler raised the issue of blending and contamination. "[W]hat about the remainder? And I can quickly do the math in my head here, 300—approximately— yeah, 360 animals, thereabout, that were not tested. So that raises concerns about commingling of infected animals ...."

Dr. Ross, a former MARC veterinarian and expert witness for the defendant, however, countered Dr. Keisler's concern about the commingling of infected animals. He testified that the flock of Texel sheep, in which MARC had never identified a case of paratuberculosis, was essentially managed as a separate unit.

[MR. BRILLIANT]: What's the significance of the fact that there were no Johne's in [T]exel sheep at MARC?

[DR. ROSS]: Essentially the reason is that the [T]exel sheep were managed as a separate unit, and they were never commingled.

Of particular significance to plaintiff with regard to the testing conducted is the fact that ram number 806173, which tested "suspect" on the initial ELISA screening, was not with held from the auction and retested prior to sale. The Federal Circuit specifically directed this court to determine "whether a person in the business of purchasing sheep at auction would understand the government's representation to indicate that reliable testing procedures had been followed with respect to all the sale animals and, if so, whether the government departed from

those procedures in a material way with respect to ram 806173." *Id.* at 993.

Defendant's expert Dr. Ross testified that the standard procedure at Allied Monitor was to retest animals that scored positive on the ELISA test.

> At that time, I had requested that we do the AGID test. The laboratory contacted me and said it was their standard procedure to screen all the serum samples initially with the ELISA test and then any that were above 2.0, which is their cut off [f]or a positive [sic] . . . they would use the AGID test as a confirmatory test.

Dr. Ross provided the rationale behind using the ELISA test as a pre-screening measure, and then using the AGID test to confirm only positive ELISA results as follows:

> [T]he intention of this whole procedure was to identify the most likely animals that would be positive, and that was done with the ELISA test, which has been shown in bovine to have a higher sensitivity so it will pick out more animals that are potentially positive. Okay. We ran the AGID test to confirm that indeed if those animals were positive, that they really were, because the AGID test has a specificity, which is about 99.9 percent while the specificity of the ELISA test is considered to be lower than that. Exactly where, if I had to guess, I would say 85 percent may be. Ninety percent. So what we were doing is we were looking at the most likely subpopulation of animals in this test group that would be positive [sheep testing positive on the initial ELISA test]. We tested them with the test that we had desired to use and they were all negative [on the confirmatory AGID test]. If the ones with high [ELISA] scores are negative [on the AGID test], why would we suspect that those

with much lower [ELISA] scores would be positive?

Although the Allied Monitor testing guidelines recommended that a "suspect" result on the initial ELISA test should be subjected to a retest in four to six months, Dr. Ross noted that the guidelines applied to cattle, not to sheep.[2]

> [MR. GUTA]: Did you discuss with Allied Monitor whether or not animals that register a suspect score on the ELISA test may, in fact, evidence progressive paratuberculosis that might be disclosed at a later test?
>
> [DR. ROSS]: [Y]es, we discussed that relative to cattle.
>
> [MR. GUTA]: Why were you talking about cattle, when you had sheep in front of you?
>
> [DR. ROSS]: Because that is the reference that the laboratory made that these were—these values were set up for cattle. . . .

The defendant did not materially deviate from standard protocol with respect to ram number 806173. In fact, at the time of the auction, there was no standard protocol in existence for testing sheep and the defendant was under no duty to run the tests for paratuberculosis as a qualification for sale of the animals. As Dr. Ross testified at the evidentiary hearing, the ELISA and AGID tests were used for "expanding" purposes only. In explaining the meaning of the word "expanding," Dr. Ross testified that the animals were examined physically for signs of disease and already qualified to be sold at the auction before they underwent additional sample testing for paratuberculosis, and that the ELISA and AGID tests were merely used as an extra, non-mandatory precaution. "They [the tests] gave us an opportunity to go beyond th[e] physical examination to see if

---

2. Allied Monitor testing guidelines, designed for testing cattle, recommended that animals testing "suspect" on the ELISA test be retested in four to six months. Ram number 806173, however, was given the initial ELISA test in July, 1992 and was sold to Mr. Dodson at the auction the following month, on August 14, 1992. At the time that Allied Monitor guidelines for cattle would have recommended retesting, the ram was already in the possession of Mr. Dodson. The plaintiff ar-

gues that defendant should have withheld the ram from sale at the auction so that it could be retested at the recommended time. If this were the case, however, the government would have had to withhold every animal testing "suspect" on the ELISA test for four to six months prior to offering them for sale at a MARC annual auction. Such a practice would only have been required if, at sale, the government was offering a warranty of disease-free animals.

we could detect animals that might show antibody evidence that they were indeed infected with paratuberculosis." The evidence in the record establishes that by conducting the tests it did, the government was attempting, in good faith, to identify diseased animals prior to sale. The defendant was not warranting disease-free animals and should not be penalized for such good faith efforts to go beyond physical examination of the animal. Having no responsibility to conduct the laboratory tests in the first place, given that the ram at issue was in the custody of Mr. Dodson at the time a retest might have been recommended, the defendant did not violate any testing procedures as alleged by the plaintiff. Furthermore, with respect to MARC's "efforts to screen sale animals," there is no evidence in the record that buyers at the auction had any reasonable expectation that the retest protocol for suspect cattle should be applied to sheep. Similarly, other than a bald allegation that the laboratory tests employed were not working because they yielded no positive results, plaintiff has offered no evidence that the tests were defective.

### III. Evidence of Paratuberculosis Infection in Ram Number 806173

Aside from the plaintiff's breach of warranty claim and the accuracy of the government's representation in the auction catalog, another issue, as to whether the plaintiff has proven that ram number 806173 was actually infected with paratuberculosis, was raised by both of defendant's witnesses. The defendant argues that because the serology report, Exhibit 103 (page 1), offered by the plaintiff is not specifically a diagnosis of paratuberculosis for ram number 806173, the plaintiff has demonstrated no injury attributable to MARC and has no valid claim in this case. *See Servidone Constr. Corp. v. United States,* 931 F.2d 860, 861 (Fed.Cir.1991) (stating the fundamental elements of a contract claim against the government as "liability, causation, and resultant injury"); *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965).

Ram number 806173 was sold to plaintiff on August 14, 1992. As plaintiff stated in its original complaint to the government contracting officer, the information provided to Dodson at the 1992 auction indicated that ram number 806173 had a birth date of April 4, 1988. The record on remand, however, contains plaintiff's Exhibit 103 (page 1), which includes a copy of an August 26, 1993 "Serology Report" for a six year old ram with an identification number not of 806173, but of 256–217, testing positive for paratuberculosis, or Johne's disease. According to its April 4, 1988 birth date, however, ram number 806173 would have been only five years old at the time of the testing. The "Urinalysis or Fecal Request" report, plaintiff's Exhibit 103 (page 2), lists the animal as "Ovine # 173, Texel M 1987," one year older than the listing for ram 806173 in the MARC auction catalog.

At the remand hearing, Mr. Wallace, the MARC Sheep Operations Manager and witness for the defendant, addressed the Inconsistency between the age of the ram on the report and the age of ram number 806173:

[MR. BRILLIANT]: [D]o you see anything on this page [Exhibit 103 (page 1)] that indicates to you, one way or another, as to whether the sheep addressed in this report is or is not ram number 806173?

[MR. WALLACE]: I see nothing to indicate for certain that it is. I do not see the animal's number on the page. I do see something which indicates it may not be 806173.

[MR. BRILLIANT]: And what is that?

[MR. WALLACE]: [T]he age reported on this animal on this report is six years, and this is in August of 1993. 806173 was born in 1988, which would have made him five years old.

[MR. BRILLIANT]: And how do you know that 806173 was born in 1988?

[MR. WALLACE]: The ear tag number. 8 is the last digit of the year that the animal was born in.

Dr. Ross, defendant's expert witness and a former MARC veterinarian, also noted the unlikelihood that a ram would be infected with paratuberculosis if none of the other Texel sheep in its flock were infected.

[MR. BRILLIANT]: What is the likelihood that a particular [T]exel sheep in the Johne's [T]exel flock having Johne's and none of the other animals having Johne's? How likely is that?

[DR. ROSS]: It would be unlikely, because normally it's passed from animal-to-animal, and if there's no Johne's in the group in which they're managed, it's unlikely that they're going to be exposed to the organism.

Furthermore, Mr. Dodson and Mr. Wallace provided inconsistent testimony regarding the severity of conditions to which Mr. Dodson's sheep were subjected when a major flood destroyed his farm. The flooding conditions were relevant to whether any disease other than paratuberculosis was present in the ram in question. Mr. Wallace testified that Mr. Dodson had told him in conversation that he was concerned about the welfare and safety of his sheep because they were "stuck on a three-acre island in the Missouri River in about ankle-deep water ...." Mr. Dodson, however, offered somewhat less definite testimony regarding the flooding conditions.

[MR. BRILLIANT]: And you never told anybody that your animals were, in fact, flooded? You never told Mr. Wallace that, for example?

[MR. DODSON]: No. They were flooded later, when we were taking them out. After this lady called from the Corp[s] of Engineers, then the ground began to go underwater. Volunteers came from all over the Midwest to help me get out.

[MR. BRILLIANT]: No, no. My question is not the whole background. The question is, were your animals, at some time prior to the end of the summer of '93, walking around in flooded areas?

[MR. DODSON]: They would have walked from the ground they were on, to be loaded onto the boats in the water.

With reference to Mr. Wallace's statements quoted above, Dr. Ross testified that if Mr. Dodson's sheep were confined on an island covered in ankle-deep water, the conditions could lead to other illnesses displaying clinical signs similar to paratuberculosis.

[DR. ROSS]: [T]hese animals certainly would be stressed from the fact that they were confined in a small area and also that their ability to rest would certainly be impaired, not only from overcrowding but unless an animal would be extremely weak and sick, I don't even think it would want to lie down in those kind of conditions.

[MR. BRILLIANT]: Could those kind of conditions cause illnesses with symptoms similar to Johne's, but not necessarily Johne's?

[DR. ROSS]: Yes, it could.

[MR. BRILLIANT]: What kind of diseases might that be?

[DR. ROSS]: I can think of two in particular. One would be salmonellosis, which causes severe diarrhea. The animal will lose condition rapidly and can reach the point where it could die or be weak enough that it need[ed] to be put down. The other one would be intestinal parasites, especially coccidiosis or something like that, which is normally picked up from the ground and from the environment and should be plentiful in that kind of an environment.

[MR. BRILLIANT]: Did you see anything in the documents in the record here suggesting whether the ram in question in this case might have had one of those two diseases you mentioned?

* * *

[DR. ROSS]: We have an indication of clinical signs, which in this case the diarrhea and the weight loss, which would be compatible with either of those diagnoses. Then under the section below [of Trial Exhibit 103, page 2][3] it says, fecal examination, fecal flotation for parasites, it has rare coccidia present. Coccidiosis is one of the two diseases I mentioned.

[MR. BRILLIANT]: [H]ow long would it take from the time of those conditions

3. This comment refers to page two of Exhibit 103 indicating that the tests were conducted on "Ovine # 173, Texel M 1987."

until the time the animal got visibly sick with the disease?

[DR. ROSS]: It could certainly be within the range of 30 to 60 days.

Finally, the defendant's expert witness Dr. Ross offered unrefuted testimony that the serology report in question provided no indication of what tests were used to detect paratuberculosis.

[MR. BRILLIANT]: Can you tell me from looking at this document what kind of serological test was done?

[DR. ROSS]: No, I cannot.

[MR. BRILLIANT]: Can you tell whether it was ELISA or AGID or some other test?

[DR. ROSS]: No, I cannot.

The evidence in the record, including evidence from the remand hearing, demonstrates first that the "Serology Report" and "Urinalysis or Fecal Request" report provided by the plaintiff, especially the "Serology Report," may not address ram number 806173. Second, the evidence indicates the possibility that ram number 806173, if addressed in the "Urinalysis or Fecal Request" report for "Ovine #173, Texel M 1987," could have been infected with coccidiosis instead of paratuberculosis, manifesting clinical signs similar to those of paratuberculosis. Third, the absence of information on the serology report indicating who administered the tests or what particular tests were used deprives that report of probative value. *See Davis Prods., Inc. v. United States,* 70 Cust. Ct. 87, 91, 1973 WL 24224 (1973) (stating that a written notation on a laboratory report made by an unidentified person could not be afforded probative value). In sum, the plaintiff has not demonstrated by a preponderance of the evidence that ram number 806173 was infected with paratuberculosis.

## CONCLUSION

As stated by the United States Court of Appeals for the Federal Circuit, the language of the auction catalog statement at issue disclosed the presence of some level of paratuberculosis in the herd and represented only that MARC had taken steps, consistent with reliable tests, to screen sale animals against paratuberculosis and other illnesses. The defendant's representation did not constitute a contractual warranty. At the time of the MARC annual auction, the ELISA and AGID tests were among the most reliable tests available for testing sheep for paratuberculosis, although more specifically intended for testing cattle. Furthermore, the testing methods that Allied Monitor employed were in compliance with the limited protocol that could be transferred from cattle to sheep. The defendant had no duty to screen its sheep for paratuberculosis prior to sale, but did so as an additional precautionary measure, following physical examination of the sheep. The court, therefore, finds MARC's representation that "[b]ased on the availability of reliable tests, or observations, efforts have been made to screen sale animals against these and other maladies" was accurate, and not misleading. The clerk's office shall **DISMISS** plaintiff's complaint, with prejudice, and enter **JUDGMENT** for the defendant. Each party is to bear its own costs.

**IT IS SO ORDERED.**